**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| KATHRYN GAY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CHILDREN'S HOSPITAL OF | ) |
| PHILADELPHIA, ELENI LANTZOUNI, | ) Case No. 2:18-cv-02880-NIQA |
| JENNIFER LOUIS-JACQUES, MICHELE | ) |
| ZUCKER, LEELA JACKSON, KATIE | ) |
| HOEVELER, MORTIMER PONCZ, AND | ) |
| ALAN R. COHEN | ) |
| | ) |
| Defendants. | ) |

**ORDER**

AND NOW, this _____ day of _____, 2023, upon consideration of

Defendant's Motion for Leave and Motion *In Limine* to Exclude the Expert Testimony of Dr. Frank

H. King and all responses thereto, it is **HEREBY ORDERED AND DECREED** that the Motion

is **GRANTED**. The Report and Supplemental Report of Dr. Frank H. King, M.D. shall be

excluded, and Dr. King shall not be permitted to provide expert testimony in this matter.

_____
The Honorable Nitza Quiñones Alejandro

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| KATHRYN GAY, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|     v. | ) |
| | ) |
| CHILDREN'S HOSPITAL OF | ) |
| PHILADELPHIA, ELENI LANTZOUNI, | )    Case No. 2:18-cv-02880-NIQA |
| JENNIFER LOUIS-JACQUES, MICHELE | ) |
| ZUCKER, LEELA JACKSON, KATIE | ) |
| HOEVELER, MORTIMER PONCZ, AND | ) |
| ALAN R. COHEN | ) |
| | ) |
|     Defendants. | ) |

**DEFENDANTS' MOTION FOR LEAVE AND**
**MOTION _IN LIMINE_ TO EXCLUDE**
**THE EXPERT TESTIMONY OF DR. FRANK H. KING**

Defendants, The Children's Hospital of Philadelphia, Eleni Lantzouni, Jennifer Louis-

Jacques, Michele Zucker, Leela Jackson, Katie Hoeveler, Mortimer Poncz, and Alan R. Cohen

("CHOP" or "Defendants"), through undersigned counsel, hereby request leave to file the instant

motion and move _in limine_ to exclude the Report, Supplemental Report and expert testimony of

Frank H. King, M.D. Defendants incorporate the arguments and law set forth in their

accompanying brief.

Dated: February 23, 2023               _/s/ Patrick M. Harrington_
                                    DILWORTH PAXSON LLP
                                    Lawrence G. McMichael, Esquire
                                    Patrick M. Harrington, Esquire
                                    Douglas M. Weck, Esquire
                                    PA Attorney Id. Nos. 28559/317998/316331
                                    1500 Market Street, Suite 3500E
                                    Philadelphia, PA 19102-2101
                                    Telephone: (215) 575-7000
                                    _Attorneys for Defendants_
                                    lmcmichael@dilworthlaw.com
                                    pharrington@dilworthlaw.com
                                    dweck@dilworthlaw.com

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KATHRYN GAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CHILDREN'S HOSPITAL OF | ) | |
| PHILADELPHIA, ELENI LANTZOUNI, | ) | Case No. 2:18-cv-02880-NIQA |
| JENNIFER LOUIS-JACQUES, MICHELE | ) | |
| ZUCKER, LEELA JACKSON, KATIE | ) | |
| HOEVELER, MORTIMER PONCZ, AND | ) | |
| ALAN R. COHEN | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR LEAVE AND MOTION *IN LIMINE* TO EXCLUDE THE EXPERT TESTIMONY OF DR. FRANK H. KING

Defendants, The Children's Hospital of Philadelphia, Eleni Lantzouni, Jennifer Louis-Jacques, Michele Zucker, Leela Jackson, Katie Hoeveler, Mortimer Poncz, and Alan R. Cohen ("CHOP" or "Defendants"), by and through their undersigned counsel, hereby move this Court to exclude the Report, of Frank H. King, Jr. M.D. ("Report"), Supplemental Report of Frank King, MD ("Supplemental Report") and expert testimony of Dr. Frank H. King, M.D. ("Dr. King").

Plaintiff claims that a CHOP hospitalization of her daughter for severe, cardiac threatening malnutrition, a hospitalization to which both Plaintiff and the child's father consented, violated her constitutional parental rights because the care was purportedly medically unnecessary. She also contends without any evidence that her daughter was being held by CHOP at the behest of the government. In support of that fiction, Plaintiff seeks to rely on Dr. King, a faux expert who lacks any qualifications to opine on the care of adolescent eating disorders and does not opine on the state-action issue. Dr. King demonstrated his lack of expertise over and over in his deposition and reports with repeated misunderstandings and misrepresentations of the record.

The Report and Supplemental Report[1] (together" Reports") of Plaintiff's expert, Dr. King, demonstrate that Dr. King's proffered testimony would be unreliable and replete with personal "opinions" that are not proper expert testimony. Dr. King's testimony will not help the jury decide this matter as it is neither reliable nor accurate, and Dr. King lacks the expertise to offer this opinion based upon his dearth of experience in the applicable subspecialty. Defendants accordingly seek a ruling excluding the Reports and expert testimony of Dr. King.  Under the Supreme Court precedent in *Daubert* and *Kumho Tire,* as well as the Third Circuit case of *UGI Sunbury LLC,* this Court has an obligation to scrutinize proffered "expert" testimony before trial and exclude such testimony that does not meet the defined standards.

## I.      PROCEDURAL POSTURE

Defendants respectfully request leave from this Court for good cause shown to move *in limine* to exclude the expert testimony of Dr. King. *See* Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent."). Over a year and a half after the deadline for motions *in limine*, Plaintiff sought leave of this Court to permit the designation of Dr. King as an expert long after the deadline to do so. [ECF 223.]  This Court granted Plaintiff leave to designate Dr. King through its November 29, 2022 order, discussing that "[p]ursuant to this Court's operative Scheduling Order, Plaintiff's expert reports were due to be produced to Defendants on April 6, 2020." [ECF 228 fn1.]  The order went on to state that "[w]hile this Court cannot and does not condone any party's failure to comply with its scheduling orders, in light of Plaintiff's previous status as a pro se litigant, Plaintiff's production of an expert report more than four (4) months before the scheduled trial, **Defendants' ability to cure any prejudice caused by**

---

[1]      True and correct copies of the Report and Supplemental Report are attached hereto as Exhibits "A" and "B," respectively.

**the untimely disclosure**, and the significance of the proffered expert testimony to Plaintiff's case, this Court finds that the extreme sanction of excluding Plaintiff's expert is unwarranted." [*Id.*] (emphasis added).

Defendants acknowledge that the Final Pretrial Order in this matter states that "[a]ll motions *in limine* shall be filed no later than April 16, 2021" [ECF 91]. In the normal course of litigation, had Plaintiff timely designated her expert, Defendants would have had the right to file a timely motion *in limine* to exclude such expert. That was made impossible because Plaintiff had designated no expert at the time of motions *in limine*. Defendants would be severely prejudiced if denied the opportunity to challenge Plaintiff's expert on *Daubert* grounds prior to trial, and Plaintiff would be rewarded for her non-compliance with this Court's order.

With this context in mind and in line with this Court's rationale memorialized in its November 29, 2022 order – that "Defendants [have the] ability to cure any prejudice caused by the untimely disclosure," Defendants seek leave to file the instant motion.

## II.  **FACTUAL BACKGROUND**

On June 14, 2016, Plaintiff's daughter, 12-years-old K, was denied admission to an intensive eating disorder program at The Renfrew Center of Southern New Jersey ("Renfrew") and directed to an emergency room because she was medically unstable: "At this time due to concerns about [K's] low blood pressure and low weight, we are recommending that she be evaluated at an emergency room or urgent care facility." [King Dep., Ex. C 95:7-96:14.][2]  Upon appearing at the CHOP emergency room that day, K was admitted to the CHOP adolescent service, with the consent of her parents, for medical stabilization of severe malnutrition, hypotension,

---

[2] Referenced pages from the deposition of Dr. King are attached hereto as Exhibit "C," in page order.

bradycardia, and orthostasis secondary to malnutrition, anorexia nervosa, weight loss, and anxiety prior to placement with an intensive eating disorder program. [CHOP Records at 65 and generally.][3]  By June 20, K was "medically stable for transfer to residential/inpatient eating disorder program" (not simply to go home without ongoing treatment). [*Id*. at 125.]  But, K was not accepted into an outside intensive eating disorder program until July 1. [*Id.* at 235.][4]  She was discharged that day. [*Id*.]

In her Amended Complaint, Plaintiff maintains that she only took K to the CHOP emergency room for a blood test. [ECF No. 6 at 10.]  Plaintiff contends that almost two years after the admission, she supposedly learned from K's medical records that the admission was not medically necessary and that CHOP was holding K at the behest of the government. [*Id*. at 3.]  She contends that CHOP's medical care violated her constitutional parental rights. [*Id*.]

Plaintiff retained Dr. King, a pediatric generalist, to provide expert testimony on the propriety of the inpatient hospitalization of Plaintiff's daughter, K. Dr. King's assessment was based on: (1) a review of CHOP's and his own medical records and other documents; (2) a review of medical literature; and (3) the verbal narrative concerning the facts of the case relayed by

---

[3] The "CHOP Records" are the authenticated and certified CHOP records generated by Lindsay Marland on July 11, 2019 that have been in the Parties' possession and used throughout this matter, and are designated in part and/or in whole as trial exhibits by both Parties to this litigation. As they are pediatric health records and as they are over 700 pages, they are not attached in full here, but are available for *in camera* inspection if desired. Excerpts are attached as Exhibit D.

[4] The July 1 disposition note reads: "Disposition: pending overnight [Heart Rate] >45, weight gain on appropriate meal plan and formulation of appropriate management plan (will need residential treatment program as parents unable to participate in FBT [(family based therapy)]. Update PCP when ready for [discharge]. Awaiting disposition from Brandywine Hospital at this time inpatient program is the most appropriate dispo[sition]. Notified of Renfrew acceptance this morning. To start 9am on 7/6. Plan to discharge after dinner when Mom is out of work. Dad will also be present for teaching/discharge instructions today. Both Mom and Dad to receive copies of all discharge instructions/teaching materials. Mom and Dad to decide where [K] will stay at discharge."

Plaintiff's counsel to Dr. King. Dr. King thereafter produced the Report in line with this Court's order, and later the Supplemental Report hours before his deposition,[5] containing a summary of certain facts, many of which are inaccurate, that formed the basis for his expert opinion.

## III.      ARGUMENT

Plaintiff has designated Dr. King to opine that K's CHOP "admission and continued stay in ICU were not medically indicated or necessary." [Ex. A at 2.] This Court should exclude Dr. King's Reports and bar him from testifying as an expert because his opinions and testimony lack the reliability and relevance required by the Rules of Evidence.

Trial courts are required to "guard against 'expertise that is *fausse* and science that is junky.'" *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 829 (3d Cir. 2020) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 159 (1999) (Scalia, J., concurring)). To that end, trial courts have a "'responsibility of acting as gatekeepers to exclude unreliable expert testimony.'" *Id.* (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendments); *see Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993) ("[U]nder the Rules [of Evidence] the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.").

The proponent of expert testimony — here, Plaintiff — bears the burden of proving by a preponderance of the evidence that expert testimony is admissible. *E.g.*, *In re TMI Litig.*, 193 F.3d 613, 705 (3d Cir. 1999).

---

[5] The "Supplemental Report" was served on counsel for Defendants at 5:00 p.m. on Sunday, January 8 — a mere 17 hours before Dr. King's deposition at 10 a.m. on Monday, January 9. But, the document was signed and dated by Dr. King on January 2 — six days earlier, but not served until the evening prior to Dr. King's deposition.

The Third Circuit has reduced Rule 702 to three interrelated requirements an expert must meet to testify: "(1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008). These related requirements are referred to in short as "qualification, reliability and fit." *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).

### A. *Qualification*: Dr. King is unqualified to offer expert testimony on whether the CHOP hospitalization and care of K for an eating disorder were medically indicated.

In Dr. King's own words, "I'm not a [sic] eating disorder physician." [King Dep, Ex. C 242:6.] Rather, Dr. King is a general pediatrician with no specialization, training, experience, or qualifications in in-patient treatment of eating disorders, out-patient treatment of eating disorders, or eating disorders generally. [*Id.* 16:10-15; 32:16-33:20.] He has no first-hand experience treating eating disorders. [*Id.* 17:17-24.] He has never published on eating disorders. [*Id.* 33:21-35:19.] He only reviewed literature on eating disorders because of his retention in this litigation. [*Id.* 25:22, 153:4-153:10.] He does not treat patients with eating disorders and sees "one or two patients a year" who he "would suspect" may have an eating disorder, but sends them to eating disorder specialists for treatment. [*Id.* 17:17-24.]  He lacks the basic qualifications to diagnose eating disorders or opine on whether K's hospitalization and care at CHOP for an eating disorder was medically indicated. The mere fact that King is a medical doctor does not mean that he has any expertise in the specialized branch of medicine relevant to this case.  He fails the first prong of the *Pineda* analysis.

"Rule 702 requires the witness to have specialized knowledge regarding the area of testimony," and "[t]he basis of this specialized knowledge can be practical experience as well as

academic training and credentials." *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998) (citations and internal quotation marks omitted). For example, a doctor with limited experience with patients with salt allergies and "limited familiarity with the literature regarding the illness" is not qualified to testify that a patient has a salt allergy. *Id.* (citing *Diaz v. Johnson Matthey, Inc.*, 893 F.Supp. 358, 373 (D.N.J. 1995)). A lack of knowledge of the relevant literature and "merely review[ing], for purposes of litigation, selected literature on th[e] subject" count against finding sufficient qualifications. *Diaz*, 893 F.Supp. at 373. Here, King admits that he has no expertise in eating disorders and cannot establish expertise through his very limited experience. His testimony is based on his review of medical literature for purposes of this litigation. But without specialized training and experience, King cannot properly construe and apply such literature in any reliable way

Dr. King does not specialize in eating disorders and has limited experience with eating disorders. Dr. King is board certified in "General Pediatrics." According to the American Board of Pediatrics, and as shown below, he became board certified in 1982, yet there is no indication of his making any effort to maintain his certification since being certified forty one years ago.[6]

**King, Jr., Frank Harrison**
ABP ID #: 42235

Print

Fort Washington, PA
United States of America

| Certification Area | Certified | Currently Practicing in This Area of Certification | Meeting MOC Requirements in This Area |
|---|---|---|---|
| **General Pediatrics** Certificate #: 28051 | Yes, certified in 1982 **No Expiration** | Not Known | No |

---

[6]    *See* Verification of Certification - The American Board of Pediatrics (*https://www.abp.org/verification-certification*)

He has been in private practice since 1979 and has no education or training relating to eating disorders or anorexia nervosa, conceding repeatedly that any expertise he possesses is limited to that obtained "within the realm of general pediatrics." [King Dep, Ex. C 16:10-15; 32:16-33:20.] He has published three times, and none of his publications relate to eating disorders. [*Id.* 33:21-35:19.] Further, the last publication he authored was in 1984, with "nothing in the last 39 years[.]" [*Id*. 35:17-19.] He was only familiar with the relevant eating disorder literature because he reviewed it for this litigation. [*Id.* 25:22, 153:4-153:10.] He sees patients he "suspects" of having an eating disorder "once or twice a year," yet admits he does not have the expertise to diagnose or treat such patients; rather "they really need to be referred to a different facility for further evaluation and treatment." [*Id*. 17:17-24.] Dr. King clearly conceded that "I'm not a [sic] eating disorder physician." [*Id*. 242:6.]

When asked about the propriety of K's refeeding protocol, which is the core medical treatment that CHOP was providing to K during her hospitalization, Dr. King said that he could not answer questions about it because "I'm not an eating disorder specialist." [*Id.* 142:7-142:23.] As the literature and K's medical records reflect, malnourished children with eating disorders needs to be re-nourished with carefully planned, prescribed and monitored daily caloric intakes and slow refeeding to prevent potentially fatal shifts in blood chemistry known as "refeeding syndrome." American Academy of Pediatrics Committee on Adolescence, "Identifying and Treating Eating Disorders," *Pediatrics*, January 2003, 111(1), 209 (emphasis added). Because he lacks qualification, Dr. King did not know what refeeding meant: "my impression of that is encouraging her to eat." [King Dep, Ex. C 142:7-142:23.]

Dr. King was a clinical affiliate of CHOP during the period of K's hospitalization in 2016, which meant that Dr. King was part of the "medical staff, but [had] no admitting privileges," which

simply bolsters "the résumé" of his practice. [*Id.* 35:21-36:6; 37:4.]  In connection with his 2015 application to be a clinical affiliate, Dr. King submitted a "robust description of [his] practice and the diagnoses that [his] practice treats," which contained more than 40 diagnoses — none of which pertained to eating disorders. [*Id*. 41:13-17.]

Dr. King is not qualified to testify as an expert on eating disorders (by his own admission) and therefore not qualified to testify as to the appropriateness of CHOP's treatment of K's eating disorder. Having failed to meet the qualification test, his testimony must be excluded.

### B. *Reliability*: Dr. King's understanding of the record and his opinions are demonstrably unreliable.

From falsely believing that K was treated in the CHOP ICU to not recognizing that K in fact did meet the criteria for hospitalization to relying on an insurance coverage denial letter that was actually reversed by the insurance company, Dr. King over and over demonstrated his complete misunderstanding of K's medical care and illness. Thus his testimony is unreliable and must be excluded.

An expert's testimony must "rest[] on a reliable foundation" or "good grounds." *Daubert*, 509 U.S. at 597, 590. The reliability analysis is wide-ranging, and reaches to the facts or data underlying the expert's opinion. *See ZF Meritor*, 696 F.3d at 291 ("'[T]he reliability analysis [required by *Daubert*] applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion.'" (*quoting Heller v. Shaw Indus., Inc*., 167 F.3d 146, 155 (3d Cir.1999))); *United States v. Mornan*, 413 F.3d 372, 380 (3d Cir. 2005) ("[T]he District Court has an obligation to evaluate the reliability of expert testimony 'where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question[.]'" (*quoting Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999))).

9

To meet Rule 702's reliability requirement, expert testimony "must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation." *Schneider*, 320 F.3d at 404 (internal quotation marks and citations omitted). "An expert opinion is not admissible if the court concludes that an opinion based upon particular facts cannot be grounded upon those facts." *Fedorczyk v. Caribbean Cruise Lines, Ltd.*, 82 F.3d 69, 75 (3d Cir. 1996). Indeed, "if an expert opinion is based on speculation or conjecture, it may be stricken." *Id.* The trial court abuses its discretion if it admits "expert testimony which is based on assumptions lacking any factual foundation in the record." *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002).

Courts have excluded expert testimony on reliability grounds where the opinions were, as here, based on a plaintiff's narrative that is contradicted by pertinent medical records. For example, in *Miller*, a personal injury case, the plaintiff's expert "admitted that he based his opinion that [a] bus accident caused [the plaintiff's] neck injury on no more than [the plaintiff's] subjective complaints and the resolution of [the plaintiff's] symptoms after surgery." *Miller v. United States*, 287 F.App'x 982, 984 (3d Cir. 2008). In accepting the plaintiff's narrative as true, the expert "took into account [the plaintiff's] statement that he had no previous neck injuries and did not review [the plaintiff's] medical records (which were significant for, among other things, previous neck injuries)." *Id.* The Third Circuit agreed with the district court that the expert "concluded that the neck injury was caused by the accident essentially because [the] plaintiff told him it was" and "did not try to rule out any other cause of the injury or consider any alternative explanations." *Id.* As such, the Third Circuit affirmed the district court's order granting the defendant's motion to preclude the expert's testimony under Rule 702's "reliability" requirement. *Id.* at 984-85.

### 1. Dr. King repeatedly criticizes CHOP for admitting Plaintiff's daughter to the ICU even though she was never treated in the ICU.

Dr. King's Report opines on the propriety of Plaintiff's daughter's admission to the ICU — however she was never treated in the ICU. [Declaration of Dr. Eleni Lantzouni, M.D. at ¶8.][7] Dr. King's proffered testimony concluding that K's "admission and continued stay **in ICU** were not medically indicated or necessary." [Ex. A at 2.] (emphasis added.) This conclusion is based upon a falsehood that appears nowhere in the medical records, but rather is apparently entirely based upon the misrepresentation of Plaintiff's counsel and/or Plaintiff that K was admitted to the ICU.

Plaintiff's daughter never received care in CHOP's intensive care unit, nor was she ever having her vitals monitored by CHOP's telemetry unit. [*See* Ex. E at ¶9.] However, Dr. King's Report starts out in the very first paragraph to state that "K presented to the Children's Hospital of Philadelphia (CHOP) the evening of 6/14/2016 for further testing required by Renfrew. K was admitted to the CHOP **intensive care unit (ICU)**, at 1:20 AM on 6/15/2016. On 7/1/2016, at 7:23 PM, K was discharged from **CHOP ICU** with instructions to report for treatment at Renfrew on 7/6/2016." [Ex. A at 1 (emphasis added).] He continues, noting that "K was a student in the Philadelphia School District **at the time of ICU admission**" [*Id.* ] (emphasis added.)  An entire section in the Report is titled "CHOP ICU History." [*Id.* at 2.]

Dr. King goes on to detail his opinion and proffered testimony – concluding that K's "admission and continued stay **in ICU** were not medically indicated or necessary." [*Id.* (emphasis added).] Treatment in the CHOP ICU appears nowhere in the medical records, as it is untrue. Dr.

---

[7] A true and correct copy of the Declaration of Dr. Eleni Lantzouni, MD is attached hereto as Exhibit "E."

King's conclusion is apparently based upon the misrepresentation of Plaintiff's counsel that K was

admitted to the ICU.

> Q: Is it accurate that the fact stated in your report that [K] was in the ICU is a fact that was given to you by counsel?
>
> A. It's quite possibly [sic]… it's possibly [sic] that it came from what was communicated by counsel.

[King Dep, Ex. C 108:1-8]. Based upon that falsity, which appears nowhere in the medical records

reviewed, Dr. King's Report opines on the propriety of Plaintiff's daughter's admission to the ICU

and her monitoring through telemetry as follows:

> **The CHOP patient data and the 17-day hospitalization in ICU are incongruous**. Vital signs from the CHOP custom flow sheet and blood test results for the night of 6/14/2016 are consistent with the PCP's medical clearance on 6/13/2016, and a letter stating that physician review of records sent by CHOP to K's insurer determined that the patient could be treated as an outpatient. The patient did have mild anemia as an outpatient, and throughout the entire hospitalization, but this is not even noted in the progress notes. **After ICU admission, K became orthostatic by heart rate as noted in the physician progress notes and nutritionist's chart.** On the day of discharge from CHOP, 7/1/2016, the recorded orthostatic change in pulse was 69 bpm (supine 64 bpm → upright 133 bpm); well above the published criteria for admission of > 20 bpm. **Rather than resolving during the 17 days of telemetry/ICU and improved nutritional status, K's orthostatic pulse changes became more extreme. The mean number of days in telemetry/ICU for children in need of intensive monitoring during eating disorder treatment is 3. K's 17 days in telemetry/ICU is not typical. The records do not mention any need to consult cardiology or neurology in addressing the orthostasis by pulse and abnormally high heart rates recorded in ICU.** It is possible that the heart rate changes were not perceived as having an underlying medical cause. This is reasonable since psychological factors are known to influence heart rate.

> **In my professional experience, the goal of ICU is to medically stabilize a presenting patient as efficiently and quickly as possible. Beds are often in short supply in ICU. As such, prolonged stays in ICU are reserved for extreme cases, and not typically used to monitor eating disorders or anorexia – particularly on a protracted basis. Outpatient care is better utilized for this function. From my review of the records, there was no medical basis for K's ICU stay to last even one day, let alone 17.**

[Ex. A at 9 (emphasis added).]

K's purported admission to the ICU is not a passing reference in the seven-page King Report,[8] or even limited to the section "CHOP ICU History." Rather, the word "ICU" appears 21 times throughout the Report. Nearly a full page of Dr. King's three-page "Opinion" section regards his conclusion that ICU care was not called for. Dr. King opines that:

- The CHOP patient data and the 17-day hospitalization in ICU are incongruous.

- After ICU admission, K became orthostatic by heart rate as noted in the physician progress notes and nutritionist's chart.

- Rather than resolving during the 17 days of telemetry/ICU and improved nutritional status, K's orthostatic pulse changes became more extreme.

- The mean number of days in telemetry/ICU for children in need of intensive monitoring during eating disorder treatment is 3. K's 17 days in telemetry/ICU is not typical.

- The records do not mention any need to consult cardiology or neurology in addressing the orthostasis by pulse and abnormally high heart rates recorded in ICU.

[Ex. A. at 9.]

At his deposition, Dr. King was questioned about his contention that K was treated in the ICU. He noted that while the goal of the ICU is to "stabilize the patient," the goal of a normal inpatient bed (*i.e.* not the ICU) is to "provide ongoing therapy." [King Dep, Ex. C 104:23-105:32.] He stated that "[c]ertainly" she should have been treated in a "regular inpatient room" (which she was) to the extent an admission was warranted. [*Id.* 106:6-14.]

Dr. King's failed to confirm the accuracy of material facts and rendered false, unreliable opinions as a result.[9]

---

[8] When removing graphs, charts, and tables, the actual substantive text of the report is approximately seven pages, of which the "Opinion" section is three pages.

[9] Dr. King's misunderstandings of the basics is presumably in part based on the cursory manner in which he approached his expert responsibilities. According to Dr. King, he only spent "[a]pproximately 11, 12 hours" up until his deposition, and somehow in that short time reviewed 700 pages of CHOP medical records, reviewed his own practice's records for K, read twenty-three

## 2. Dr. King based his analysis in part upon a health insurance company's initial coverage denial letter even though the insurance company reversed its decision and covered K's treatment as medically necessary.

Dr. King's Report cites to "a letter stating that physician review of records sent by CHOP to K's insurer determined that the patient could be treated as an outpatient." [Ex. A. at 2.]  The Supplemental Report deals exclusively with this analysis of K's insurer, and states that Dr. King "review[ed] documents produced at bates label KING 001-KING 067 and "[t]he newly reviewed records… provide additional support for my opinions." [Ex. B.]

He opines that:

[T]he medical records contain an insurance denial from United Healthcare Community Plan for Kids ("UHC") at KING_019. This insurance denial further corroborates my opinions that [K]'s inpatient stay at CHOP was not medically necessary. Specifically, the record states the insurance claim was "[d]enied completely because . . . it was not medically necessary." In short, independent physicians from UHC reviewed [K]'s records and, in addition to myself, determined that based on the objective medical records, inpatient care was medically unnecessary.

[*Id*.]

Dr. King was questioned about these insurance records he relied upon, and specifically the "independent physicians from UHC… [who] reviewed [K]'s records" and "determined that based on the objective medical records, inpatient care was medically unnecessary." [King Dep 77:3-8.] Dr. King conceded that he did not know what physicians at UHC reviewed the records in formulating the claim denial and then approval. He further conceded that he made no attempt to contact UHC to speak with the physicians. [*Id.* 77:3-22.]  Thus, Dr. King is completely unaware of the methodology or analysis used by these "independent physicians," what expertise they have

---

scholarly articles, drafted and rewrote a thirteen page report, and met with Plaintiff's counsel approximately six times. [King Dep, Ex. C. 23:4-6; 27:17-21; 152:20-153:15].

in eating disorders, if any, but yet relies upon their conclusion as one of the bases of his Reports and opinions.

Even more problematic, Dr. King fails to point out that a few pages earlier in that same production (KING_008-KING_0011), UHC **approved** the inpatient stay, stating unequivocally that "UnitedHealthcare Community Plan has reviewed the request and **approved the service(s).**"[10]



So, Dr. King claimed that the insurance company physicians independently supported his opinion, even though those physicians ultimately reached a conclusion opposite to Dr. King's opinion.

Although Dr. King claimed to have based his opinion that hospitalization was not medically indicated on the medical literature, he failed to note that the literature highlights that insurance companies routinely deny coverage for appropriate inpatient treatment for children with

---

[10] A true and correct copy of the referenced documents from the production of Dr. King's records is attached hereto as Exhibit "F."

eating disorders. As the American Academy of Pediatrics explains in a report cited by Dr. King: "Criteria for the hospitalization of children and adolescents with eating disorders have been established by the Society for Adolescent Medicine. . . . **Unfortunately, many insurance companies do not use similar criteria**, thus making it difficult for some children and adolescents with eating disorders to receive an appropriate level of care." "Identifying and Treating Eating Disorders," *Pediatrics*, *id.*, at 208-209 (emphasis added).

Expert testimony must employ valid scientific methods and "must be supported by appropriate validation — *i.e.*, 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590. Dr. King's reliance upon the insurance denial, later reversed, by a third-party insurance company flies in the face of Rule 702 and *Daubert*. His conclusion that treatment was not medically necessary is undercut by the claim **approval** of this very same third-party, an approval that Dr. King failed to even mention.

### 3. Dr. King's lack of expertise is further exhibited by his conflation of different eating disorders.

Dr. King also conflated indicators for hospitalization for anorexia with indicators for hospitalization bulimia, **a different disease** that K did not have. According to Dr. King, Table 2 that appears on pages 7 and 8 of the Report is "Adapted from Campbell K, Peebles R. *Eating disorders in children and adolescents: state of the art review*. Pediatrics. 2014;134(3):582-592." [Ex. A, at 7-8; King Dep, Ex. C 108:9-21; 109:9-13.]  Dr. King uses the suggested criteria in Table 2 on pages 7 and 8 of the Report and Table 1 of the Report as dispositive of hospital admission, stating that "none of the recommended criteria for inpatient treatment of pediatric malnutrition were met (Table 2)." [*Id.* at 8.] However, many of the criteria he cited pertain to bulimia, an eating disorder that K did not have. K obviously did not meet criteria for hospitalization for bulimia because she was not hospitalized for bulimia. [*See* Ex. E at ¶7.] Rather, her diagnosis by Dr. King's

own practice, confirmed by CHOP, was anorexia nervosa. [Ex. A, at 1; Ex. D, at 125; Ex. E at ¶6.]

Dr. King improperly uses the obvious fact that K did not meet irrelevant criteria for hospitalization

for bulimia to somehow show that K did not meet the criteria for hospitalization for anorexia, and

apparently to insinuate that K was perfectly healthy.

By way of example, Dr. King reviewed the below comparison charts during his deposition

and agreed that these charts clearly differentiate between Anorexia Nervosa ("AN") and Bulimia

Nervosa ("BN"), while his Table 2 lumps all symptoms together without any such differentiation.



Campbell K, Peebles R. Eating disorders in children and adolescents-state of the art review. Pediatrics 2014

TABLE 4 American Academy of Pediatrics Criteria for Inpatient Hospitalization in Eating Disorders

| Anorexia Nervosa | Bulimia Nervosa |
|---|---|
| Heart rate <50 beats/min daytime; < 45 beats/min nighttime | Syncope |
| Systolic blood pressure <90 mm Hg | Serum potassium <3.2 mmol/L |
| Orthostatic changes in pulse (>20 beats/min) or blood pressure (>10 mm Hg) | Serum chloride <88 mmol/L |
| Arrhythmia | Esophageal tears |
| Temperature <96°F | Cardiac arrhythmias including prolonged QTc |
| <75% ideal body weight or ongoing weight loss despite intensive management | Hypothermia |
| Body fat <10% | Suicide risk |
| Refusal to eat | Intractable vomiting |
| Failure to respond to outpatient treatment | Hematemesis |
| | Failure to respond to outpatient treatment |

Identification and Management of Eating Disorders in Children and Adolescents - Pediatrics 2010

TABLE 7 Criteria for Hospital Admission for Children, Adolescents, and Young Adults With Eating Disorders[22]

AN
<75% ideal body weight or ongoing weight loss despite intensive management
Refusal to eat
Body fat < 10%
Heart rate < 50 beats per min daytime; <45 beats per min nighttime
Systolic pressure < 90 mm Hg
Orthostatic changes in pulse (>20 beats per min) or blood pressure (>10 mm Hg)
Temperature < 96°F
Arrhythmia

BN
Syncope
Serum potassium concentration < 3.2 mmol/L
Serum chloride concentration < 88 mmol/L
Esophageal tears
Cardiac arrhythmias including prolonged QTc
Hypothermia
Suicide risk
Intractable vomiting
Hematemesis
Failure to respond to outpatient treatment

EXHIBIT
20
King 1/9/2023 G.B.

Dr. King conceded that his chart hid the distinction, notwithstanding that anorexia and bulimia are

different diseases:

```
14      Q.  So let me just recap and make sure I
15   accurately understand what you're talking about.  So
16   you have a chart in your report that lists all of
17   these criteria that pertain to anorexia and bulimia,
18   correct?
19      A.  Mm-hmm, yes.
20      Q.  Kalina was not diagnosed with bulimia, but
21   only anorexia, correct?
22      A.  Correct.
```

[King Dep., Ex. C 246:14-22.] Dr. King admitted that his report references irrelevant criteria for hospitalization for a disease that K did not have. [*Id*. 249:5-16.]

### 4. Dr. King opined that K did not meet the criteria for hospitalization even though she did.

Most shocking is that Dr. King opines that K's hospitalization was not medically indicated even though the hospitalization was warranted according to the literature he cites in his report. Dr. King represented that "none of the recommended criteria for inpatient treatment of pediatric malnutrition were met (Table 2)." [Ex. A at 8.] Although the "criteria" are really just guidelines,[11] K met a number of the criteria for hospitalization according to the charts in Exhibit 20 above.

Upon admission, K was suffering from:

- Ongoing weight loss despite treatment, including losing over 15% of her weight in roughly 6 months

- Food refusal

- Low blood pressure

- Bradycardia arrhythmia

- Orthostatic by pulse

---

[11] *See, e.g.*, American Psychiatric Association Work Group on Eating Disorders, *Practice Guideline for the Treatment of Patients with Eating Disorders* 5 (3d ed. June 2006) ("These parameters of practices should be considered guidelines only.").

[CHOP Records at 63-65.] Throughout her hospitalization, she continued to suffer from bradycardia, hypotension, orthostasis by heart rate, food refusal, and required supplementation to complete her meal plan among a host of other things. [*See* Ex. E, ¶10.]

Even on the day that she was discharged by CHOP upon acceptance to the Renfrew program, as Dr. King admitted, [*id.* at 271:1-271:7], K was still orthostatic by pulse, a guideline criteria for hospitalization, and had still only reached 77.5% of goal weight. [CHOP Records at 234.] So, even the charts that Dr. King relied upon do not support his conclusion that none of the criteria were met at the time of the hospitalization. He is plainly unqualified to render reliable opinions regarding CHOP's medical treatment of K.

Dr. King's Reports are rife with unreliable or simply incorrect data and analysis.  K was never in the ICU, an insurance denial and later approval has no bearing on appropriateness of care, K was diagnosed with anorexia, not bulimia, and K met numerous admission criteria. Dr. King's Reports and expert testimony is completely unreliable and as such, must be excluded.

### C.   *Fit*: Because King is unqualified and relies upon demonstrably false facts and faulty analysis, his testimony does not meet the "fit" requirement.

The guiding analysis with "fit" is whether testimony from Dr. King "will help the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702(a). The fit "requirement is one of relevance and expert evidence which does not relate to an issue in the case is not helpful." *In re TMI Litig.*, 193 F.3d at 670. If the proposed testimony is "particularly confusing" or not connected to the "particular disputed factual issues in the case," a Court may exclude such testimony as it does not help to understand the evidence. *Paoli*, *supra* 35 F.3d at 747, 743 (internal quotation marks omitted). Plaintiff bears the burden of establishing the "fit" of King's testimony in this matter, and Plaintiff cannot satisfy this burden.

Dr. King's Reports and testimony consist of uninformed opinions based on simply wrong material facts without any expertise or experience in treatment of eating disorders in children. It is clear that Plaintiff intends to proffer an unqualified witness who will offer unreliable testimony. With such a dearth of qualification and reliability, his testimony cannot help the trier of fact to understand the evidence or to determine a fact in issue. Dr. King's Reports should be excluded, and his testimony should not be permitted at trial.

## IV.        CONCLUSION

For those reasons, it is respectfully requested that this Court should grant Defendants' motion and bar Dr. King from offering expert testimony at trial.

Dated: February 23, 2023                     */s/ Patrick M. Harrington*
                                             **DILWORTH PAXSON LLP**
                                             Lawrence G. McMichael, Esquire
                                             Patrick M. Harrington, Esquire
                                             Douglas M. Weck, Esquire
                                             PA Attorney Id. Nos. 28559/317998/316331
                                             1500 Market Street, Suite 3500E
                                             Philadelphia, PA 19102-2101
                                             Telephone: (215) 575-7000
                                             Facsimile: (215) 575-7200
                                             *Attorneys for Defendants*
                                             lmcmichael@dilworthlaw.com
                                             pharrington@dilworthlaw.com
                                             dweck@dilworthlaw.com

# Exhibit A

## Gay v. Children's Hospital of Philadelphia, et al.

## Report of Frank H. King, Jr. M.D.

**Professional Background**

See attached CV

**K█████████**

In the spring and summer of 2016, K███ █████ ████████, (K), (dob ██████████) was a 12 year-old girl. She was diagnosed with anorexia by her primary care provider (PCP), Gilda Johnson, CRNP, on June 2, 2016, as part of an evaluation for placement at the Renfrew Center of Southern New Jersey (Renfrew), which offered an intensive outpatient treatment program for eating disorders. K presented to the Children's Hospital of Philadelphia (CHOP) the evening of 6/14/2016 for further testing required by Renfrew. K was admitted to the CHOP intensive care unit (ICU), at 1:20 AM on 6/15/2016. On 7/1/2016, at 7:23 PM, K was discharged from CHOP ICU with instructions to report for treatment at Renfrew on 7/6/2016.

Pre-CHOP Admission History

K was a student in the Philadelphia School District at the time of ICU admission. On 5/27/2016, the school nurse recorded her weight as 84.2 [lbs] with shoes, and 83.5 [lbs] without shoes. The school reported K's father to the Pennsylvania Childline for suspected child maltreatment the same day. The following day, an investigation of K's mother, Plaintiff, for suspected child abuse/neglect was initiated. On 5/31/2016, CHOP recorded K's weight as 37.3 kg (82 lbs 3.7 oz), diagnosed severe malnutrition, and K disclosed that she did not feel safe with her dad. The diagnosis of severe malnutrition is "based on weight loss = >10% of usual body weight… per medical chart 97 pounds at PCP visit October 2015". During the investigation of the unfounded allegation of the mother for child abuse/neglect, K was determined to be medically stable by Philadelphia Child Protective Services on June 2, 2016. K's ECG heart rate was 50 beats per minute (bpm) at CHOP on 6/7/2016, 3:32 PM. On 6/13/2016, the PCP examined K for the last time, noting improvement, and confirming she was medically clear for intake at Renfrew the following afternoon.

DocuSign Envelope ID: 32D67C61-8443-4D8B-A995-08707C7B3BA

## Presentation to CHOP

On 6/14/2016, at 8:27 PM, K presented to CHOP for lab work (phosphorous), and medical clearance. The need to determine medical clearance was due to concern about a low blood pressure reading at Renfrew that afternoon, and the low heart rate recorded at CHOP seven days before. The CHOP triage nurse noted: "Patient states she is doing well and eating. Also states she has baseline anxiety but feels she is doing great with her current care..." K's initial physical exam findings at CHOP, including blood pressure and heart rate, were normal, describing K as "alert, well developed, well nourished, in no acute distress and thin". However, after consulting CHOP Adolescent Medicine, the attending physician wrote "[o]n exam, alert, mild to moderate malnourished. Noted bradycardia. Discussed with adolescent service, recommend admission for monitoring." CHOP records further noted that K had played kickball on the same day she presented to the hospital, June 14, and was constipated in October 2015.

At CHOP the night of 6/14/2016, K's blood results had several abnormalities, comparable to those previously described in the PCP notes scanned into the CHOP records (Table 1). Published criteria for inpatient care are useful in assessing clinical findings, including blood test results, and vital signs (Table 2). Notably, the patient's weight was 39.1 kg on June 14, an increase of 1.8 kg from the previous weight recorded at CHOP. Also, at 54 bpm, the ECG heart rate, although lower than the exam pulse, was higher than the ECG heart rate recorded at CHOP the afternoon of June 7. On the night of presentation, the difference in pulse, following standard protocol after standing from a supine position, was 10 bpm; the difference in blood pressure, 2 mm Hg. Clinically, K was not orthostatic by heart rate or blood pressure at CHOP the night of June 14, 2016.

Further, her phosphorus level was noted to be normal; potassium level only slightly decreased. Abnormal levels of potassium may create an added risk for concern in patients with eating disorders. As such, her admission and continued stay in ICU were not medically indicated or necessary.

## CHOP ICU History

The CHOP records show that K's initial caloric intake on 6/15/2016 in CHOP's ICU (1600 kcal) was less than what it was as an outpatient (~2600 kcal estimated by the CHOP nutritionist). This caloric reduction corresponds with weight loss in the hospital. A custom flowsheet of all recorded vital signs from June 14 to July 1, 2016, was created in the CHOP records. The lowest weight and

lowest pulse recorded in this flowsheet were 36.8 kg and 46 bpm, respectively. Both occurred on June 16. As K's caloric intake increased, so did her weight. The differential diagnoses listed in the physician progress notes for K's malnutrition are: "anorexia nervosa, food restriction secondary to stress, other ED NOS [eating disorder not otherwise specified]." On June 17, the patient was started on Miralax®, an over-the-counter laxative. The records also show that K was given a daily adult vitamin with minerals in ICU, which she previously received as an outpatient. Other than the daily multivitamin, Miralax® is the only medicine noted in the CHOP records during K's ICU hospitalization.

As on the night of admission, the physician progress notes for June 16, 17, 18 and 19 state that the patient was "alert, well developed, well nourished, in no acute distress and thin". Other than mildly elevated blood carbon dioxide, laboratory test results on June 19 were all within normal limits. The records do not indicate K as ever having received nasogastric or intravenous nutrition in ICU. The patient was able to eat normally, without assistance. Boost®, a nutritional shake, was routinely used to replace milk which the patient stated she did not drink due to a previous aversion, from being force fed milk by her father. Data for determining patient orthostasis was recorded in the physician daily progress notes and the flowsheet. The difference in pulse, following standard protocol after standing from a supine position, was 62 bpm on June 19. On the date of discharge, July 1, this difference was 69 bpm. K was diagnosed as being orthostatic by heart rate (only) in CHOP ICU. Recorded blood pressures, however, show that K was never orthostatic by blood pressure, nor was she ever noted to be symptomatic.

Weights recorded at CHOP show a 5% increase in K's weight between 5/31/2016 and presentation to the hospital on 6/14/2016. K's lowest weight as an outpatient at CHOP (5/31/2016) was used to calculate a BMI of 15.57 $kg/m^2$, putting her in the 9th percentile (BMI Z score = -1.32). However, a diagnosis of severe malnutrition was based on the record high weight, a single data point, recorded at her PCP, 8 months before. When K presented to CHOP on 6/14/2016, the BMI had increased to 16.4 $kg/m^2$, 19th percentile (BMI Z score = -0.88). K's record low weight was on 6/16/2016; the BMI decreased to 15.4 $kg/m^2$, dropping to the 7th percentile (BMI Z score = -1.44). By 6/22/2016, her BMI increased to 16.9 $kg/m^2$, 26th percentile (BMI Z score = -0.64). On 6/29/2016, K's BMI was 17.15 $kg/m^2$, 29th percentile (BMI Z score = -0.55).

The CHOP attending physician disposition notes shed light on the hospital's assessment of K's needs. The disposition note for the night of 6/14/2016 states, "Admit to inpatient unit for intravenous fluids and ongoing monitoring of intake and output to assess for progression of illness." However, no intravenous fluids were administered in the inpatient unit while the patient was monitored during the following 17 days. The disposition notes for June 15 and 16 are identical: "Renfrew vs. FBT, mom is open to other therapies". June 16 is when the all-time-low weight and heart rate are recorded. On June 17, 18, 19 and 20, the disposition notes all state, "pending overnight [heart rate] HR >45, weight gain on appropriate meal plan and formulation of appropriate management plan (eating disorder program such as Renfrew vs. FBT)". At the June 20 "family meeting" attended by the parents, CHOP adolescent medicine physicians, social work and behavioral health, "it was determined that the parents are incapable of participating in FBT." The CHOP social worker explains that "Patient's father does not trust that patient's mother will comply with the plan and the mother feels that patient's father's presence is detrimental to K█████'s recovery." Interestingly, the multidisciplinary problem of "ABUSE/NEGLECT" became "resolved" on June 20, without any reason stated in the records. However, after an incident, on June 17, in which the patient became "visibly upset and crying… [with the HR] elevated to 130's…" and "K█████ stated that she does not want her dad to be here", the attending physician instructed the psychiatric technician "and her colleagues [to] document in EPIC their observations about interactions between K and each of her parents." Subsequent psychiatric technician notes describe interactions between the patient, mother and others. In contrast, each time the patient sees her father, it is noted that she becomes upset, often crying +/- shaking and pulling the covers over her head. Another attending physician, on June 28, wrote:

> Spent 40 minutes with father and resident, social worker joined for 20 minutes. Discussed medical progress so far, and need to bring back 1:1. Father concerned that history of covert purging with bathroom or outside after meals at his home the past few months. Discussed potential alternate plan of Renfrew day program if Brandywine cannot take the patient. He would prefer she be at Brandywine but would be amenable to treatment at Renfrew. Father very worried about patient hating him for trying to bring her to dietitian and making her eat - explained this is part of her anorexia illness and should improve with time. Reviewed again that with parents not able to get on the same page, FBT at CHOP is not an option.

From June 21 through July 1, the disposition notes are identical: "pending overnight HR >45, weight gain on appropriate meal plan and formulation of appropriate management plan (will need residential treatment program as parents unable to participate in FBT)". The overnight HR was consistently recorded as >45 from June 18 through patient discharge, 14 days later.

DocuSign Envelope ID: 32D67C61-8448-4D8B-A995-098707C7B3BA

Table 1.

| | CHOP 06/14/2016 22:50 | PCP 06/07/2016 16:46 | PCP 05/27/2016 07:16 |
|---|---|---|---|
| **Sodium** | 139 (Ref. range 136 - 145 mmol/L) | 140 (Ref. range 134 - 144 mmol/L) | 140 (Ref. range 134 - 144 mmol/L) |
| **Potassium** | 3.6 (L) (Ref. range 3.8 - 5.4 mmol/L) | 4.1 (Ref. range 3.5 - 5.2 mmol/L) | 5.1 (Ref. range 3.5 - 5.2 mmol/L) |
| **Chloride** | 102 (Ref. range 90 - 106 mmol/L) | 99 (Ref. range 97 - 108 mmol/L) | 99 (Ref. range 97 - 108 mmol/L) |
| **Carbon Dioxide** | 26 (Ref. range 20 - 26 mmol/L) | 23 (Ref. range 17 - 27 mmol/L) | 26 (Ref. range 17 - 27 mmol/L) |
| **Urea Nitrogen** | 18 (H) (Ref. range 5 - 17 mg/dL) | 17 (Ref. range 5 - 18 mg/dL) | 17 (Ref. range 5 - 18 mg/dL) |
| **Creatinine** | 0.5 (Ref. range 0.2 - 0.5 mg/dL) | 0.69 (Ref. range 0.42 - 0.75 mg/dL) | 0.78 (H) (Ref. range 0.42 - 0.75 mg/dL) |
| **Glucose** | 76 (Ref. range 70 - 106 mg/dL) | 80 (Ref. range 65 - 99 mg/dL) | 111 (H) (Ref. range 65 - 99 mg/dL) |
| **Calcium** | 9.1 (Ref. range 8.4 - 10.1 mg/dL) | 9.6 (Ref. range 8.9 - 10.4 mg/dL) | 9.7 (Ref. range 8.9 - 10.4 mg/dL) |
| **Phosphorus** | 5.1 (Ref. range 3.3 - 5.4 mg/dL) | – | |
| **Magnesium** | 2.0 (Ref. range 1.5 - 2.5 mg/dL) | 2.6 (Ref. range 1.6 - 2.3 mg/dL) | |
| **HGB** | 11.1 (L) (Ref. range 12.0 - 16.0 g/dL) | 11.6 (L) (Ref. range 11.7 - 15.7 g/dL) | 14 (Ref. range 11.7 - 15.7 g/dL) |
| **HCT** | 33.5 (L) (Ref. range 36.0 - 46.0 %) | 34.4 (L) (Ref. range 34.8 - 465.8 %) | 41.3 (Ref. range 34.8 - 465.8 %) |

DocuSign Envelope ID: 32D67C61-8448-4D8B-A095-028707C7B3BA

| | | | |
|---|---|---|---|
| **MCV** | 94.1<br>(Ref. range 78.0 - 102.0 fL) | 91<br>(Ref. range 77 -  91 fL) | 91<br>(Ref. range 77 - 91 fL) |
| **WBC** | 7.6<br>(Ref. range 4.2 - 9.4 K/uL) | 5.4<br>(Ref. range 3.7 - 10.5 K/uL) | 6.6<br>(Ref. range 3.7 - 10.5 K/uL) |
| **Neutrophils (Absolute)** | 2.68<br>(Ref. range 1.82 - 7.47 K/uL) | 2.3<br>(Ref. range 1.2 - 6.0 K/uL) | 2.6<br>(Ref. range 1.2 - 6.0 K/uL) |
| **Lymphocytes (Absolute )** | 4.33 (H)<br>(Ref. range 1.16 - 3.33K/uL) | 2.7<br>(Ref. range 1.3 - 3.7 K/uL) | 3.5<br>(Ref. range 1.3 - 3.7 K/uL) |
| **Thrombocytes** | 197<br>(Ref. range 150 - 400 K/uL) | 208<br>(Ref. range 176 -  407 K/uL) | 221<br>(Ref. range 176 -  407 K/uL) |

Table 2.

| Criteria for Inpatient Hospitalization in Eating Disorders[*] | Data for K in CHOP Records |
|---|---|
| Heart rate, <50 beats/min daytime;     <45 beats/min nighttime | 78 beats/min sitting (6/14/2016, 10:45 PM) <br> 52 beats/min sitting (6/15/2016, 1:01 AM) |
| Systolic blood pressure , <90 mm Hg | 99 mm Hg (6/14/2016, 10:45 PM) |
| Orthostatic changes in pulse (>20 beats/min) or blood pressure (>10 mm Hg) | 10 beats/min (6/14/2016, 10:50 to 10:52 PM) <br> 2 mm Hg |
| Temperature <96°F | 98.6 °F (6/14/2016, 10:45 PM) |
| <75% ideal body weight or ongoing weight loss despite intensive management | 71% ideal body weight <br> Based on October 2015 High Weight: 97.75 per PCP records, the goal weight = 52.9kg, 116lbs [39.7 kg (6/14/2016, 10:45 PM) is 71% of the goal weight] <br> Weights recorded at CHOP show a 5% weight gain between 5/31/2016 and 6/14/2016) |
| Body fat <10% | Not noted |
| Refusal to eat | "Patient states she is doing well and eating" |
| Syncope | None noted |
| Serum potassium <3.2 mmol/L | 3.6 mmol/L (6/14/2016, 10:50 PM) |
| Serum chloride <88 mmol/L | 102 mmol/L (6/14/2016, 10:50 PM) |
| Serum phosphorus <3 mg/dL | 5.1 mg/dL (6/14/2016, 10:50 PM) |
| Serum sodium <136 mmol/L | 139 mmol/L (6/14/2016, 10:50 PM) |
| Esophageal tears | None noted |
| Arrhythmia or QTc >450 ms | Sinus bradycardia on EKG at 54 beats/min QTc = 415 ms (6/14/2016, 10:27 |

DocuSign Envelope ID: 32D67C61-8448-4D8B-A995-928707C7B3BA

|                                              | PM)                                                                                                                                                     |
|----------------------------------------------|---------------------------------------------------------------------------------------------------------------------------------------------------------|
| Hypothermia                                  | None noted                                                                                                                                               |
| Suicide risk                                 | "No suicide ideation"                                                                                                                                    |
| Intractable vomiting                         | "Has thrown up around seeing Dad; high anxiety"                                                                                                          |
| Hematemesis                                  | None noted                                                                                                                                               |
| Failure to respond to outpatient treatment   | Weight increase as outpatient from 37.3 kg (5/31/2016) to 39.1 kg (6/14/2016) EKG heart rate increase from 50 beats/min daytime (6/7/2016) to 54 beats/min nighttime (6/14/2016) |

[*] Adapted from Campbell K, Peebles R. Eating disorders in children and adolescents: state of the art review. *Pediatrics*. 2014;134(3):582-592.

## **Opinion**

With the exception of ideal body weight, review of the medical records for K██████████ (K), (dob 11/26/2003) show that on the night of presentation to CHOP, 6/14/2016, none of the recommended criteria for inpatient treatment of pediatric malnutrition were met (Table 2). Several abnormalities in blood test results were found, consistent with previous outpatient data (Table 1). None were significant enough to warrant inpatient care. Moreover, measurements in K's weight and heart rate, taken at CHOP shortly before admission, indicate an upward trend, suggestive of outpatient treatment efficacy. Her BMI never went below the DSM-5's 5th percentile threshold, and the Z score never became more extreme than mild. While patient growth charts are recommended to assess the expected growth trajectory to calculate ideal body weight, the CHOP record's emphasis of a single PCP data point taken 8 months prior to presentation is unusual. It is all the more odd that the CHOP diagnosis of "severe malnutrition" is based on this non-CHOP data point, obtained during a period that the patient was reported to be constipated. Unlike the note of K's weight by the school nurse in the CHOP records, the PCP note with this data point does not specify whether, or not, shoes were worn. On the night of presentation to CHOP, the recorded orthostatic change in pulse was 10 bpm (supine 52 bpm → upright 62 bpm); below the published criteria for admission of > 20 bpm.

DocuSign Envelope ID: 32D67C61-8443-4D8B-A995-028707C7B3EA

Further, K's phosphorus level was normal; potassium level only mildly decreased (and then only very briefly). As such, K did not present with a risk of significant hypokalemia or hyperkalemia, which might indicate the need for inpatient admission or monitoring in ICU.

The CHOP patient data and the 17-day hospitalization in ICU are incongruous. Vital signs from the CHOP custom flow sheet and blood test results for the night of 6/14/2016 are consistent with the PCP's medical clearance on 6/13/2016, and a letter stating that physician review of records sent by CHOP to K's insurer determined that the patient could be treated as an outpatient. The patient did have mild anemia as an outpatient, and throughout the entire hospitalization, but this is not even noted in the progress notes. After ICU admission, K became orthostatic by heart rate as noted in the physician progress notes and nutritionist's chart. On the day of discharge from CHOP, 7/1/2016, the recorded orthostatic change in pulse was 69 bpm (supine 64 bpm → upright 133 bpm); well above the published criteria for admission of > 20 bpm. Rather than resolving during the 17 days of telemetry/ICU and improved nutritional status, K's orthostatic pulse changes became more extreme. The mean number of days in telemetry/ICU for children in need of intensive monitoring during eating disorder treatment is 3. K's 17 days in telemetry/ICU is not typical. The records do not mention any need to consult cardiology or neurology in addressing the orthostasis by pulse and abnormally high heart rates recorded in ICU. It is possible that the heart rate changes were not perceived as having an underlying medical cause. This is reasonable since psychological factors are known to influence heart rate.

In my professional experience, the goal of ICU is to medically stabilize a presenting patient as efficiently and quickly as possible. Beds are often in short supply in ICU. As such, prolonged stays in ICU are reserved for extreme cases, and not typically used to monitor eating disorders or anorexia – particularly on a protracted basis. Outpatient care is better utilized for this function. From my review of the records, there was no medical basis for K's ICU stay to last even one day, let alone 17.

K presented to CHOP stating that she had baseline anxiety but felt she was doing great with her current care. Multiple CHOP staff noted K's anxiety when seeing her father, and statements K made warranted further investigation. Although the records note that K was receiving outpatient psychological therapy, there is no indication that K's therapist was ever consulted. I cannot speak

to any psychological factors which may have been assessed in the physicians' treatment plan. Patient data in the CHOP records, that I reviewed, do not indicate any medical basis to admit K the night of 6/14/2016. Inconsistencies between the patient data and progress note statements may have generated confusion about the severity of K's malnutrition. However, by 6/20/2016, the vital signs and blood lab results should have clarified any questions about medical stability. I cannot find any medical explanation for hospitalizing the patient until the night of 7/1/2016.

Regarding criteria for admission and for continued hospitalization, K met none of the stated admission criteria for CHOP.

- Low HR< 50 while awake
- Low BP (systolic < 90)
- Abnormal electrolytes (Potassium, Phosphorus, Sodium)
- Hypothermia
- Syncope or near syncope
- Orthostatic changes in BP (drop in systolic > 10 mm Hg) accompanied by dizziness or near fainting
- Abnormal ECG (prolonged QTc in the setting of vomiting or low heart rate less < 50 and other worrisome arrythmias)
- Refusal to eat or drink > 24 – 48 hours (admission will be based on objective findings of dehydration etc., not just on history of refusal to eat)
- Suicide ideation (needs evaluation by Behavioral Health at ER or crisis center)
- Intractable vomiting
- Weight < 75 % mBMI (especially in the setting of abrupt and significant weight loss)

On 4/8/2016 (2 months prior to admission), K's weight was noted to be 92+1/2 lbs; on 5/9/2016 in PCP's office: 86 lbs; on 5/31/2016 at CHOP: 82+3.7oz; on 6/14/2016 in CHOP ER: 86lbs+3.2 oz. Notation of being orthostatic was based only upon HR after assuming erect body position, never symptomatic nor hypotensive by BP determination. Throughout her hospitalization laboratory results were normal and/or consistently improving and her vital signs stable (except as noted with BP). However, nor referrals to Cardiology nor Neurology were pursued. And, yet, despite all of this, consistent documentation of the pathological relationship between K and her father continued, K remained hospitalized with continued unlimited visitation rights by both parents. It is unclear why she was retained as an inpatient.

Thus, in summary, admission criteria, as well as those for subsequent continued lengthy hospitalization, for eating disorders were not met. Interventions stated at the outset to justify the admission were not instituted since they were not medically necessary. Medical care rendered during hospitalization was limited to monitoring of the patient (and her parents); there was no clinical evidence for the patient being medically unstable (and, thus, no need for any interventions)

 I have a reasonably certain medical opinion that K was inappropriately hospitalized as well as retained in the hospital for an inordinately prolonged time span.

*Frank H. King, Jr.*

DocuSigned by:
4708ED481BA84AA...

Date:   10/26/2022

## Materials Reviewed

☐   CHOP records for K███████

☐   Declaration of Janee Johnson

☐   Declaration of Gilda Johnson

☐   Letter from United Healthcare Community Plan for Kids to the Children's Hospital of Philadelphia dated 6/17/2016.

## Testifying Experience

-   None in last four years.

## Literature References

American Academy of Pediatrics Committee on Adolescence. Policy Statement: Identifying and Treating Eating Disorders. Pediatrics, January 2003, 111(1), 204-211.

American Dietetic Association. Position of the American Dietetic Association: Nutrition Intervention in the Treatment of Anorexia Nervosa, Bulimia Nervosa, and Other Eating

Disorders. Journal of the American Dietetic Association. December 2006; 106(12), 2073-2082.

American Psychiatric Association. *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition: DSM-5* (American Psychiatric Association, 2013).

American Psychiatric Association Work Group on Eating Disorders. Practice Guideline for the Treatment of Patients with Eating Disorders. Third Edition; June 2006.

Bouma S. Diagnosing Pediatric Malnutrition. Nutr Clin Pract. 2017 Feb;32(1):52-67.

Campbell K, Peebles R. Eating disorders in children and adolescents: state of the art review. *Pediatrics*. 2014; 134(3):582-592.

Di Cola G, Jacoangeli F, Jacoangeli F, Lombardo M, Iellamo F. Cardiovascular disorders in anorexia nervosa and potential therapeutic targets. Intern Emerg Med 2014; 9: 717-21.

Homan GJ. Failure to Thrive: A Practical Guide. Am Fam Physician. 2016 Aug 15;94(4):295-9.

Hofer M, Pozzi A, Joray M, Ott R, Hähni F, Leuenberger M, von Känel R, Stanga Z. Safe refeeding management of anorexia nervosa inpatients: an evidence based protocol. Nutrition, 2013; 30: 524-30.

Kapoor WN. Syncope and hypotension. In: Braunwald E (ed). Heart Disease, 5th edition. Philadelphia: WB Saunders, 1992: 863–76.

Leclerc A, Turrini T, Sherwood K, Katzman DK.. Evaluation of a nutrition rehabilitation protocol in hospitalized adolescents with restrictive eating disorders. Journal of Adolescent Health, 2013; 53: 585-89.

Mehta NM, Corkins MR, Lyman B, Malone A, Goday PS, Carney LN, Monczka JL, Plogsted SW, Schwenk WF; American Society for Parenteral and Enteral Nutrition Board of Directors. Defining pediatric malnutrition: a paradigm shift toward etiology-related definitions. JPEN J Parenter Enteral Nutr. 2013 Jul;37(4):460-81.

DocuSign Envelope ID: 22D67C61-8443-4D85-A995-993707C7B3BA

Nahshoni E, Weizman A, Yaroslavsky A, Toledano A, Sulkes J, Stein D. Alterations in QT dispersion in the surface electrocardiogram of female adolescents diagnosed with restricting-type anorexia nervosa. J Psychosom Res 2007; 62: 469-72.

Peebles R, Lesser A, Park CC, Heckert K, Timko CA, Lantzouni E, Liebman R, Weaver L. Outcomes of an inpatient medical nutritional rehabilitation protocol in children and adolescents with eating disorders. Journal of Eating Disorders, 2017; 5:7.

Rocks T, Pelly F, Wilkinson P. Nutrition therapy during initiation of refeeding in underweight children and adolescent inpatients with anorexia nervosa: a systematic review of the evidence. Journal of the Academy of Nutrition and Dietetics, 2014; 114: 897-907.

Rosen DS and the Committee on Adolescence. Identification and Management of Eating Disorders in Children and Adolescents. Pediatrics 2010; 126: 1240-1253.

Schatz IJ. Orthostatic hypotension. Arch Intern Med 1984;144: 773–4.

Shamim T, Golden NH, Arden M, Filiberto L, Shenker IR. Resolution of vital sign instability: An objective measure of medical stability in anorexia nervosa. J Adolesc Health 2003; 32: 73-7.

Society for Adolescent Health and Medicine. Medical Management of Restrictive Eating Disorders in Adolescents and Young Adults. Journal of Adolescent Health, 2015; 56: 121-125.

Sylvester CJ, Forman SF. Clinical Practice Guidelines for Treating Restrictive Eating Disorder Patients During Medical Hospitalization. Current Opinion in Pediatrics 2008, 20: 390-397.

Treasure J, Zipfel S, Micali N, Wade T, Stice E, Claudino A, Schmidt U, Frank GK, Bulik CM, Wentz E. Anorexia nervosa. Nat Rev Dis Primers. 2015 Nov 26;1:15074.

Whitelaw M, Gilbertson H, Lam PY, Sawyer SM. Does aggressive refeeding in hospitalized adolescents with anorexia nervosa result in increased hypophosphatemia? Journal of Adolescent Health, 2010; 46: 577-82.

Yahalom M, Spitz M, Sandler L, Heno N, Roguin N, Turgeman Y. The significance of bradycardia in anorexia nervosa. Int J Angiol 2013; 22 (2): 83-94.

# MEDICAL RECORDS REVIEWED

Blood Labs and Results

    Outpatient - ordered by ZAVOD KING BARTLETT PEDIATRICS

        5/21/2016 …………………………………………….. 730 - 731

        6/7/2016 …………………………………………... 737 - 740

    Inpatient - ordered by CHOP

        6/14/2016 to 6/28/2016 …………………………………… 256 - 290

Vital signs

    Outpatient - recorded by ZAVOD KING BARTLETT PEDIATRICS

        5/11/2016 to 5/9/2016…………………………….……. 730 - 731

        6/2/2016 ………………………………………….. 733 - 734

    Inpatient - recorded by CHOP

        6/14/2016 to 7/1/2016 ………………………… 53 - 55, 600 - 627

Electrocardiogram

    Outpatient - ordered by ZAVOD KING BARTLETT PEDIATRICS

        6/7/2016 ……………………………………. 38, 735, 736, 764

    Inpatient - ordered by CHOP

        6/14/2016 …………………………………….……….……. 765

        6/29/2016 …………………………………….……….……. 767

# Index

Weight/Height/Growth curves

    CHOP

        11/15/2006 to 7/1/2016 …………………………………… 524 - 525

    NEMOURS PEDIATRICS

        Age 6 3/12 to  12 2/12 ………………………... 724 - 726, 742 - 743

    ZAVOD KING BARTLETT PEDIATRICS

        5/11/2015 to 5/9/2016 …………………………….………….. 727

        5/11/2015 to 5/13/2016? ……………………...….... 721 - 722

        5/11/2015 to 5/27/2016? …………………………....…..... 732

        6/2/2016 ..………………………………………….. 733 -734


Daily diet/Weight/Orthostatics ……………..……………..……………... 83 - 84


Physical exam findings

    6/14/2016……..……………………………………………… 46 - 47

    6/15/2016 ……..………………………………………… 67 - 68

    6/16/2016 ……………..……………………………………… 91

    6/17/2016 ……………..……………………………………… 101

    6/18/2016 ……………..……………………………………… 109

    6/19/2016 ......…………………………………………… 115 - 116

    6/20/2016 ……………..……………………………………… 124

    6/21/2016 ……………..……………………………………… 130

# Index

Physical exam findings (Cont'd)

6/22/2016 …………..…………………………………… 144

6/23/2016 …………..…………………………………… 159

6/24/2016 …………..…………………………………… 166

6/25/2016 …………..…………………………………… 176

6/26/2016 …………..…………………………………… 182

6/27/2016 …………..…………………………………… 189

6/28/2016 …………..…………………………………… 196

6/29/2016 …………..……………………………… 218 - 219

6/30/2016 …………..…………………………………… 255

7/1/2016 …………..…………………………………… 234


All medication administration …………….…..……………….…..……….…... 59 - 61


Registered dietician evaluations

Outpatient - referral by ZAVOD KING BARTLETT PEDIATRICS

5/31/2016 ……………………………………………….. 22 - 31

Inpatient

6/15/2016 ……………………………………………….. 73 - 79

6/22/2016 ……………………………………………….. 147 - 151

6/29/2016 ……………………………………………….. 205 - 208

# Curriculum Vitae

# Frank Harrison King, Jr. M.D.

## Personal:

- **Home Address:** ▮▮▮▮▮▮▮▮
  Fort Washington, Pennsylvania 19034-1213

- **Telephone Number:** (215)-▮▮▮▮ (cell)

- **Office Address:** 100 Church Road, Suite 300
  Ardmore, Pennsylvania 19003
  (610)-896-8582

- **Date of Birth:** ▮▮▮▮▮▮

- **Birthplace:** Philadelphia, Pennsylvania

- **Citizenship:** USA

- **Marital Status:** Married since 1982 (wife-Linda; 2 sons, 5 grandchildren)

## Education and Training:

| Undergraduate School | Dates | Degree |
|---|---|---|
| • Bucknell University Lewisburg, Penna. 17837 | Sept. 1968-May 1972 | B.S. 1972; Biology |

| Graduate/Professional School | Dates | Degree |
|---|---|---|
| • Temple Univ. School of Medicine Philadelphia, Penna. 19140 | Sept. 1972-June 1976 | M.D. 1976 |

**Graduate Medical Education**

| | | |
|---|---|---|
| • Residency, Pediatrics | St. Christophers Hosp. for Children; Philadelphia, Penna. | June 1976-June 1979 |

**Licensure**

| | |
|---|---|
| • Pennsylvania | MD-020529E |

**Board Certification**

| | |
|---|---|
| • National Board of Medical Examiners, Diplomate | 1980 |
| • American Board of Pediatrics, Diplomate | 1982 |

## Appointments:

### Academic

- Instructor in Pediatrics, Department of Pediatrics,         July 1979-July 1991
  University of Pennsylvania School of Medicine

- Clinical Assistant Professor (Adjunct), Dept. of Pediatrics     Oct 2015-present
  Temple University School of Medicine

- Assistant Professor, Department of Pediatrics,         May 2016-present
  University of South Florida School of Medicine

- Clinical Assistant Professor of Pediatrics, Dept. of Pediatrics     May 2019-present
  Philadelphia College of Osteopathic Medicine

### Hospital

- The Children's Hospital of Philadelphia,     Attending Physician  (1979-July 1991)
  Division of General Pediatrics     Clinical Affiliate (July 1991-present)
  Department of Pediatrics

- The Bryn Mawr Hospital     Attending Physician (1995-present)
  Department of Pediatrics

- St. Christophers Hospital for Children     Attending Physician (1996-2000)
  Division of General Pediatrics     Clinical Affiliate (2000-present)
  Department of Pediatrics

- Lehigh Valley Hospital/Health Network     Attending Physician (2008-present)
  Department of Pediatrics

## Professional Activities:

### Educational

- CHOP, Attending Rounds and Ward Attending, one month/year (1979-80; 1988-90)
- Univ. of Penna. Med. School, Attending Rounds at CHOP, for Penn medical students, one month/year (1981-83)
- Hospital of Univ. of Penna.; Pediatric lecturer for Childbirth Educ. Course (1990-2020)
- Univ. of Penna. Med. School; Preceptor for Ped. Course 250 (2nd, 3rd year students) and Ped. Course 301 (3rd, 4th year students) (1993-96)
- Temple Univ. School of Medicine; Preceptor for Fundamentals of Clinical Care course (1st year students) (1992-99)
- Temple Univ. Sch. of Med.; Preceptor for Doctoring II Course (2nd yr students) (2006-2020)

- Lehigh Valley Health Network; Preceptor for University of South Florida, Penn State University, and Drexel University (3rd, 4th year students) and Residents (Pediatrics and Family Practice) (2008-present)
- Preceptor for medical students from other various medical schools (1979-present)

**Clinical**

- Private practice of Pediatrics in Philadelphia and Ardmore (Pa.) (1979-95; 2000-present)
- Employed pediatric physician of AHERF, practicing in same locations (1995-98)
- Employed pediatric physician of Tenet Physician Services, practicing in same locations (1998-2000)
- Lehigh Valley Physician Group, pediatrician, in Allentown (Pa.) (2008-present)

**National Conferences**

- American Academy of Pediatrics National Conf. (2005, 2008, 2009, 2015, 2016, 2017, 2019, 2020)
- APLS Course: 2008 (AAP), 2014, 2018

## Service:

- AlphaCare, Inc. (Phila., Pa.); Founder and Chairman, Board of Directors (1979-present); Medical Director
- Bethany Christian Services (adoption and foster care services); consulting pediatrician (1980-present)
- Delaware Valley Pro-Life Alliance, member; (1980-2005)
- Tenth Presbyterian Church (Phila., Pa.), lecturer on human sexuality; (1988-2012)
- Physicians for Life (Phila., Pa.), member; (1996-2005)

## Professional Organizations:

- American Academy of Pediatrics, Diplomate
- Penna. Chapter of American Academy of Pediatrics, Diplomate
- Philadelphia Pediatric Society; Board member (2001-03)

## Publications:

- Berman, B., King, F., Rubenstein, D., Long, S.; "Bacteroides fragilis meningitis in a neonate successfully treated with Metronidazole", Journal of Pediatrics, Vol. 93, No. 5, pp. 793-5 (Nov. 1978)
- Casey, R., McMahon, R., McMormick, M.V., Pasquariello, P.S, Jr., Zavod, W., and King, F.H.; "Fever Therapy: An Educational Intervention for Parents." Pediatrics 73: pp. 600-5, 1984.
- King, F., "Fibroma of the Jaw", Medical and Pediatric Oncology 10:553-6 (1982) Alan R. Liss, Inc. NY, NY.

**<u>FEE SCHEDULE</u>**

$350/hr for Expert Services

9/2022

# Exhibit B

**Gay v. Children's Hospital of Philadelphia, et al.**

**Supplemental Report of Frank King, M.D.**

I have recently had the opportunity to review documents produced at bates label KING_001-KING_067.  I incorporate the opinions iterated in my Expert Report in this matter. The newly reviewed records do not change my opinions in this case; in fact, the records provide additional support for my opinions.

For example, the medical records contain an insurance denial from United Healthcare Community Plan for Kids ("UHC") at KING_019.  This insurance denial further corroborates my opinions that K███'s inpatient stay at CHOP was not medically necessary.  Specifically, the record states the insurance claim was "[d]enied completely because . . . it was not medically necessary." In short, independent physicians from UHC reviewed K███ s records and, in addition to myself, determined that based on the objective medical records, inpatient care was medically unnecessary.  In my experience as a pediatrician, coverage is only denied in these circumstances when there is indeed no medically necessary reason for the patient's inpatient stay.

All of these supplemental opinions are to a reasonable degree of medical and scientific certainty.

Frank King M.D.
1/2/2023

# Exhibit C

1              IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

                            - - -

3

KATHRYN GAY,                 :   CIVIL ACTION

4        Plaintiff,          :
                             :

5        vs.                 :
                             :

6   THE CHILDREN'S HOSPITAL  :
    OF PHILADELPHIA, et al., :

7        Defendant.          :   NO. 2:18-CV-02880-NIQA

8                            - - -

9              Monday, January 9, 2023

10                           - - -

11

12       Videotaped deposition of FRANK H. KING,

13  M.D., taken pursuant to Notice and remotely via

14  Zoom, commencing at 10:13 a.m., and reported

15  stenographically by Grace M. Baldino, Professional

16  Shorthand Reporter and Notary Public in and for the

17  Commonwealth of Pennsylvania.

18                           - - -

19

20

21

22

23

24

1      A.    That is correct.

2      Q.    We can take the exhibit down.  Thank you.

3  What is the name of your private practice?

4      A.    Ardmore Chestnut Pediatrics and Adolescent

5  Medicine.

6      Q.    And what is the office address you

7  practice from?

8      A.    100 Church Road, Suite 300, Ardmore,

9  Pennsylvania 19003.

10      Q.    And how long have you been -- has your

11  practice been at that address?

12      A.    The practice has gone by a number of

13  different name changes, but I've been within the

14  entity of the practice since July of 1979.

15  July 2nd, 1979.

16      Q.    You noted earlier that you saw patients

17  this morning.  Is your role in the practice that of

18  a treating physician and not an administrator?

19      A.    Correct, correct.  A hundred percent --

20  100 percent seeing patients.  Clinician, yes.

21      Q.    Do you handle management of the practice,

22  or do you have administrative personnel that -- from

23  a business side, nondoctors that manage the practice

24  otherwise?

1   A.   I am the managing physician.   I have an

2   office manager.

3   Q.   What are the ages of the patients that you

4   see in your practice?

5   A.   Newborns up to age 21, 22, 23.   Young

6   adults.

7   Q.   So you have treated young adults between

8   18 and approximately 23?

9   A.   Correct.

10  Q.   Have you treated -- do you currently or

11  have you treated patients with eating disorders?

12  A.   Yes.

13  Q.   What eating disorders have you treated

14  patients for?

15  A.   Bulimia nervosa, anorexia nervosa, eating

16  disorder, eating refusal.

17  Q.   And how often do you see patients with any

18  of those diagnoses?

19  A.   Well, I would suspect the diagnosis, but

20  then they really need to be referred to a different

21  facility for further evaluation and treatment.

22  Q.   How often do you see patients in which you

23  suspect one of those diagnoses?

24  A.   Probably once or twice a year.

1    Q.   Okay.  All right.  Those are a few

2  administrative things I wanted to get out of the

3  way.  So, Dr. King, you're appearing as an expert in

4  this matter.  How much time have you spent on this

5  case so far?

6    A.   Approximately 11, 12 hours.

7    Q.   And when were you first contacted about

8  becoming an expert in this matter?

9    A.   Approximately August of 2022.

10   Q.   And who contacted you?

11   A.   Andrew Lacy and Shane Rumbaugh.

12   Q.   We can bring the exhibit down.  Thank you.

13  How did they reach out to you?

14   A.   I'm assuming by phone, but it may have

15  been by email.  I have to [audio distortion] check.

16   Q.   So August of 2022 is when they reached out

17  initially?

18   A.   Approximately.

19   Q.   Okay.  Counsel's brief before the court

20  stated that, quote, "Plaintiff, by and through

21  counsel, only recently was able to speak with

22  Dr. King, who had no obligation as a witness who

23  would be subject to a subpoena to speak to plaintiff

24  before trial."  That representation was made in a

1   and Shane Rumbaugh.

2       Q.   Did Andrew Lacy and Shane Rumbaugh select

3   the documents you were to review?

4       A.   I'm not sure of that but -- I'm not sure

5   of that.  I don't know whether there are additional

6   documents.  I'm not privy to that information.

7       Q.   Okay.  I'll ask the question a different

8   way.  Did you decide, these are the documents upon

9   which I'm going to base my report, or did counsel

10  for plaintiff say, these are the documents we'd like

11  you to review to prepare a report about?

12           MR. LACY:  Objection.  Don't answer that.

13      That's work product.

14  BY MR. HARRINGTON:

15      Q.   Were documents obtained from any source

16  other than plaintiff's counsel?

17      A.   When the request came up for office

18  records and I was asked to review them, they were

19  the only additional documents as well as -- I'm

20  sorry?

21      Q.   I didn't want to interrupt you.

22      A.   As well as doing a literature review.

23      Q.   What were you asked to do by plaintiff's

24  counsel in this case?  I'm not asking for

```
 1        daughter.   I have a right to explore his

 2        knowledge, association, relationship with

 3        plaintiff.

 4              MR. LACY:   Okay.   You can answer.

 5              THE WITNESS:   Approximately October 2015

 6        as a new patient at the practice.

 7   BY MR. HARRINGTON:

 8        Q.   Is that the first time you met K████

 9   ████████   as well?

10        A.   That's correct.

11        Q.   Do you recall how old she was at your

12   first meeting?

13        A.   Approximately 10 or 11 years old.

14        Q.   Have you read Kathryn Gay's deposition

15   transcript in this case?

16        A.   No, I've not.

17        Q.   Okay.   About how many times have you

18   discussed this case with plaintiff's counsel since

19   your being retained in August of 2022?

20        A.   Approximately -- I've not kept track of

21   that.   Approximately six times.   That's a pure

22   guesstimate.

23        Q.   How many times have you discussed this

24   case with Kathryn Gay since being retained in August
```

1  of 2022?

2      A.   Oh, none.  I have no contact.

3      Q.   Okay.  Do you know in terms of -- you said

4  you spent -- I forgot -- 12, 13 hours on this case.

5  Do you know offhand how much you've incurred in fees

6  in this matter?

7      A.   You misstated the number that I mentioned.

8  I said 11 to 12 hours.  You said 12 or 13 hours.

9      Q.   My apologies.

10     A.   My hourly rate is 350, so the math is

11 fairly simple to do.

12     Q.   So that hourly rate comes from a fee

13 schedule and your expert report, correct?

14     A.   Correct.

15     Q.   And it lists your fee at 350.  Is that for

16 all activities?

17     A.   Could you restate the question?

18     Q.   Sure.  So, sitting here today in your

19 deposition, you're getting paid $350 an hour,

20 correct?

21     A.   That is my medical expert testimony fee,

22 the hourly rate.

23     Q.   And in terms of the hours spent drafting

24 your report, also $350 an hour?

1      Q.    You've also had some academic

2  appointments?

3      A.    Correct.

4      Q.    And, like you said, they are in your CV,

5  so I don't need the belabor what's in there, but

6  just -- you had a -- you were instructor of

7  pediatrics at Penn from '79 to '91, a clinical

8  assistant professor at Temple from 2015 to present,

9  an assistant professor at the University of South

10 Florida School of Medicine from 2016 through

11 present, and a clinical assistant professor of

12 pediatrics at the Philadelphia College of

13 Osteopathic Medicine from 2019 through present; is

14 that all accurate?

15     A.    Correct.

16     Q.    Okay.  Does your academic career or has

17 your academic career involved any specialized

18 training in anorexia nervosa?

19     A.    Just within the realm of general

20 pediatrics.

21     Q.    Okay.  And would that also apply to other

22 eating disorders, only within the realm of general

23 pediatrics?

24     A.    That is correct.

1    Q.   Has your academic career involved any

2    specialized training in criteria for inpatient

3    admission for pediatric patients presenting with

4    eating disorders?

5    A.   Within the context of general pediatrics,

6    yes.

7    Q.   I'll try to say this briefly:  Has your

8    subsequent residency, attending positions, or other

9    clinical appointments involve any specialized

10   expertise in anorexia nervosa, eating disorders in

11   general, or inpatient criteria other than general

12   pediatrics?

13   A.   Just within general pediatrics.

14   Q.   And do you teach in any of these academic

15   positions outside of the realm of general pediatrics

16   specifically about anorexia nervosa, eating

17   disorders in general, or criteria for inpatient

18   admission for pediatric patients presenting with

19   eating disorders?

20   A.   Within the realm of general pediatrics.

21   Q.   Your report lists three publications that

22   you authored, if we can just bring them up real

23   quick.  The first one is "Bacteroides fragilis

24   meningitis in a neonate successfully treated with

 1    Metronidazole".

 2         A.    Bacteroides fragilis with Metronidazole.

 3         Q.    There you go.

 4              THE TECHNICIAN:  Counsel, I'm sorry.  What

 5         are you requesting?

 6              MR. HARRINGTON:  Oh.  I was asking you to

 7         just bring up that article.  It starts

 8         "Bacteroides" -- B-A-C-T-E-R-O-I-D-E-S.  I

 9         probably --

10              THE WITNESS:  Bacteroides fragilis,

11         medication, Metronidazole [indiscernible].

12              THE TECHNICIAN:  One moment.

13    BY MR. HARRINGTON:

14         Q.    And I'm not -- you know, there's no need

15    to get into the substance of this article, but this

16    was authored in -- it was published in November of

17    1978, and will you agree that this article doesn't

18    have any -- relevance is not the right -- agree that

19    this article is not on the subject of anorexia

20    nervosa, eating disorders in general, or criteria

21    for inpatient admission for pediatric patients

22    presenting with eating disorders?

23         A.    Was that a question?

24         Q.    Yes.  I was -- this article has nothing to

1   do with eating disorders, correct?

2          A.   That is correct.

3          Q.   And you authored two other articles, one

4   of which is a 1984 article entitled "Fever Therapy:

5   An Educational Intervention for Parents".  Can we

6   agree that that article also doesn't pertain to

7   eating disorders?

8          A.   Correct.

9          Q.   And a third article you authored in 1982

10  called "Fibroma of the Jaw," also agree that has

11  nothing to do with eating disorders?

12         A.   Correct.

13         Q.   So have there been any other publications

14  you've had since these 1978, 1984, and 1982

15  publications?

16         A.   No.

17         Q.   So nothing in the last 39 years?

18         A.   Nothing in the literature.  That is

19  correct.

20         Q.   Okay.  You can bring the exhibit down.

21  Thank you.  You were a clinical affiliate to CHOP

22  for the period of K████'s hospitalization, correct?

23         A.   I believe so.

24         Q.   If I represent that was for the period

1   from July 1, 2015 through June 30th, 2017, does that

2   seem accurate to you?

3       A.   Yes.

4       Q.   What is a clinical affiliate?

5       A.   On the medical staff, but no admitting

6   privileges.

7       Q.   Does it provide you with -- strike that.

8   Why would you, as a independent practice, in private

9   practice, want to be a clinical affiliate with the

10  Children's Hospital of Philadelphia?

11      A.   From the institution's perspective, you

12  get an invoice to have to pay medical staff dues on

13  an annual basis or biannual basis, so they get

14  money, and for professional validity to -- for

15  families to say that you're affiliated, you're on

16  staff, in name -- basically name only with

17  Children's Hospital of Philadelphia.

18      Q.   So is it -- not directly, obviously, but

19  does it potentially offer an economic advantage to

20  the practice by being able to represent that it's a

21  clinical affiliate?

22      A.   I'm not sure that it -- I'm not sure the

23  word "economic advantage" --

24      Q.   I can reword that.  Does it add, you know,

1  gravitas to the practice, adds to your practice's

2  résumé of affiliations, and, you know, things along

3  those lines?

4          A.   It adds to the résumé, yes.

5          Q.   And you have to apply to be a clinical

6  affiliate, correct?

7          A.   Absolutely.

8          Q.   And do you recall you filled out an

9  application in 2015 to be a clinical affiliate for

10  CHOP?

11          A.   It has to be -- the renewal of staff

12  privileges is done every two years.

13          Q.   And you did that in 2015?

14          A.   I don't remember the year.  I did it

15  several months ago for the next two years, but I

16  can't keep track of it.  Each of these institutions

17  are on all different schedules.

18          Q.   Understood.  But the process -- let me

19  know if I misstate this -- the process is you fill

20  out an application -- in this case, a renewal

21  application -- the application goes and is --

22  results in an appointment by the CHOP board of

23  trustees, and, in connection with that application,

24  you fill out a number of forms, correct?

1    Q.   Well, you had raised that there are other

2    things that aren't listed.  Was the purpose of your

3    raising that to say it's not an exhaustive list?

4    A.   It's not an exhaustive -- this is not an

5    exhaustive list.  That is correct.

6    Q.   I agree; hence the language, "among many

7    others"?

8    A.   Correct.

9    Q.   But you'd agree that 40 are listed, but

10   none of the listed ones are anorexia, bulimia, or

11   other eating disorders?

12   A.   Restate that question.

13   Q.   Do any of the approximately 40 diagnoses

14   that you list on here -- understanding it's not an

15   exhaustive list, are any of those 40 diagnoses an

16   eating disorder?

17   A.   No.  They're not -- it's not specifically

18   listed, but would be included among many others.

19   Q.   Understood.  We can take the exhibit down.

20   Your report noted that you haven't testified in a

21   case in the last four years, but by your prior

22   testimony, it seems like you have served as an

23   expert prior to that?

24   A.   Correct.

1        A.    I was -- I was -- yes.   I'm -- you used

2    the word "declaration".   Deposition -- again, I'm

3    not -- is declaration the same thing as deposition?

4    I -- are they different -- but, yes, I was presented

5    with the document to review.

6        Q.    By plaintiff's counsel?

7        A.    Correct, yes.

8        Q.    And you're aware that Janee Johnson is a

9    trial witness for plaintiff?

10       A.    No, I'm not aware of that.

11       Q.    You'll agree that Janee Johnson works for

12   Philadelphia Child -- Department of -- Philadelphia

13   DHS, right?

14       A.    Yes.   I'm aware of that because that's

15   listed in the declaration, but prior to seeing that,

16   I had no idea who this person was.

17       Q.    Can you explain what relation a child

18   protection officer for Philadelphia has on your

19   opinion that the care provided by CHOP's physicians

20   was not medically necessary?

21       A.    Please restate that.

22       Q.    What bearing does Ms. Johnson's

23   declaration have on your opinion that the care

24   provided by CHOP was not medically necessary?

1    A.   Can I restate the question, or you want to

2    restate it --

3    Q.   I could -- we could do either.  Why don't

4    you propose a question that you feel comfortable

5    answering, and I'll let you know if that's what I

6    was looking for.

7    A.   What, if anything, did the declaration

8    from Janee Johnson have on my medical evaluation and

9    medical opinion in generating my report?

10    Q.   That -- yes.

11    A.   On my medical evaluation -- my medical

12    evaluation and medical report, it had no bearing.

13    Q.   Okay.  We can take down the exhibit.

14    Okay.  You can bring up the declaration of Gilda

15    Johnson.  You'll recall reviewing this.  It's listed

16    in your report.  You've seen it before, right?

17    A.   Correct.

18    Q.   Who's Gilda Johnson?

19    A.   A certified nurse practitioner --

20    pediatric nurse practitioner.

21    Q.   Does she work for you?

22    A.   Yes.  She's employed by the practice.

23    Q.   Currently?

24    A.   That is correct.  At that time and

1  supplemental report -- which we could look at if

2  you'd like, but it was only written a few days

3  ago -- it states that, quote, "Independent

4  physicians from UHC" -- which is United

5  Healthcare -- "reviewed K██████'s records and, in

6  addition to myself, determined that based on the

7  objective medical records, inpatient care was

8  medically unnecessary."  Do you recall writing that?

9       A.   Yes, I did.

10      Q.   What physicians at UHC reviewed K██████'s

11  records?

12      A.   What physicians?  I don't know.

13      Q.   You don't know their names?

14      A.   No.  I never do.

15      Q.   So you haven't spoken with them?

16      A.   No.  That's -- within the medical

17  community, that is -- and in dealing with insurance

18  companies, it's extraordinarily difficult.

19  Extraordinarily difficult.

20      Q.   Understood.  Did you make attempts to

21  speak with them?

22      A.   No.  We were not even notified that she

23  was in the hospital there, but it would have been

24  the -- appropriate for the physicians caring for her

```
 1                        -  -  -

 2              (Discussion was held off the record.)

 3                        -  -  -

 4              THE TECHNICIAN:  We are back on the

 5         record, 12:24 p.m.

 6    BY MR. HARRINGTON:

 7              Q.   If we could show a document entitled

 8    "Renfrew Letter".  You can just zoom in a little bit

 9    so you can see the whole document.  That might be

10    the easiest way to do that.  Sorry.  Zoom out so

11    that it's -- I meant out.  Dr. King, have you seen

12    this letter before?

13              A.   Can you make it bigger?

14              MR. LACY:  Patrick, does it have a Bates

15         number on it?

16              MR. HARRINGTON:  It doesn't.  It's

17         Defendant's Trial Exhibit 24.  It's been

18         produced to your client in connection with the

19         documents produced by Mirek Kozlowski and has

20         been of record as a trial exhibit since

21         February of 2021.

22              THE WITNESS:  I think we've seen this

23         letter before.

24    BY MR. HARRINGTON:
```

1    Q.   Okay.  So I won't ask you a question about

2  acknowledging, but -- and I'm not gonna ask you it

3  for Zoom, but, in your expertise, receiving a

4  directive from a medical institution that states,

5  "At this time, due to concerns about K█████

6  █████████'s low blood pressure and low weight, we

7  are recommending that she be evaluated at an

8  emergency room or urgent care facility," reading the

9  document, you'd agree it makes no mention of lab

10  work, correct?

11    A.   That is correct.

12    Q.   And, specifically, it makes no reference

13  to a phosphorous level, right?

14    A.   That is correct.

15    Q.   Would it be typical for a subacute care

16  facility or an outpatient facility like Renfrew to

17  direct a patient to an ER for just lab work?

18    A.   I'm gonna respond in two ways, if I could.

19  As per appropriate medical care, it would be most

20  appropriate to have contact with the health care

21  providers that know the patient the best; that is,

22  back to the pediatric facility, pediatric office.

23  But, on the other hand, number two, unfortunately,

24  what often happens is, to use the coined phrase,

1  indicated or necessary."  Did I read that correctly?

2      A.   Yes, you did.  Yes.

3      Q.   And on page nine, in your opinion, you

4  reference, "In my professional experience" -- here

5  we go.  Right here.  "In my professional experience,

6  the goal of ICU is to medically stabilize a

7  presenting patient as efficiently and quickly as

8  possible.  Beds are often in short supply in ICU.

9  As such, prolonged stays in ICU are reserved for

10  extreme cases and not typically used to monitor

11  eating disorders for anorexia, particularly on a

12  protracted basis.  Outpatient care is better

13  utilized for this function.  From my review of the

14  records, there was no medical basis for K's ICU stay

15  to last even one day, let alone 17."  Did I read

16  that correctly?

17      A.   You have read my -- correct, you have read

18  the words correctly.

19      Q.   You note that the ICU, one of its goals is

20  to medically stabilize a presenting patient as

21  efficiently and quickly as possible.  Separately,

22  what is the goal of an ER?

23      A.   In general, to stabilize the patient, but

24  in -- for her perspective, it was for evaluation.

1    Q.   And what would be the goal of a normal

2  inpatient bed that is not in the ICU?

3    A.   Provide ongoing therapy.

4    Q.   Are there any other levels of care in a

5  children's hospital like CHOP -- you've been in

6  Children's Hospital and St. Christopher's and

7  others -- aside from the ER?

8    A.   Oh, yes.  Many different levels.

9    Q.   Okay.  Back to the ICU, you stated that

10  beds are often in short supply in the ICU.  Was that

11  your experience as an attending?

12    A.   Well, I didn't take care of patients --

13  well, I did not take care of patients in the

14  intensive care unit, but it's always a dilemma, and

15  it's been high -- it was highlighted during the

16  COVID epidemic.

17    Q.   Yeah.  That speaks to your point that in

18  your report you state, "Prolonged stays in the ICU

19  are reserved for extreme cases and not typically

20  used to monitor eating disorders or anorexia."  What

21  would be an extreme case?

22    A.   Medical instability.

23    Q.   And can an eating disorder or anorexia be

24  extreme in the context of medical instability?

```
 1        A.   Oh, of course.

 2        Q.   But your contention is K███████'s case was

 3   not extreme in terms of medical instability?

 4        A.   She did not meet the criteria, as we've

 5   talked about before.

 6        Q.   So understanding that your report states

 7   that inpatient treatment was not indicated at any

 8   time, is it your opinion that after being triaged

 9   from the ER, K██████ should have been moved to a

10   regular inpatient room rather than the ICU?

11        A.   Certainly within two or three days if

12   indeed she need -- the decision was made to admit

13   her, that's a whole other issue, or to res a room or

14   to be discharged.

15        Q.   Do you recall where in the records it

16   indicated that K██████ was in the ICU?

17        A.   I don't.  I'd have to look through the

18   records.

19        Q.   Do you recall ever reading in any of the

20   records the word "ICU" or "intensive care unit"?

21        A.   I'd have to go through the records.

22             MR. HARRINGTON:  I'd like to take a break

23        for Dr. King to point out where in the records

24        it mentions ICU or intensive care unit.  Can we
```

1      do that?

2              THE WITNESS:  Mm-hmm.

3              MR. HARRINGTON:  And we'll resume --

4              THE WITNESS:  [Audio distortion] off the

5      record?

6              MR. HARRINGTON:  Can we go off the record?

7              THE TECHNICIAN:  We are off the record,

8      12:38 p.m.

9                          - - -

10         (Whereupon there was a recess in the

11     proceeding from 12:38 p.m. to 12:54 p.m.)

12                         - - -

13             THE TECHNICIAN:  We are back on the

14     record, 12:54 p.m.

15  BY MR. HARRINGTON:

16     Q.    Dr. King, your report makes extensive

17  statements about K████'s presence in an ICU bed for

18  a number of days, part or all of her

19  hospitalization.  Is it accurate that your -- the

20  fact that she's in the ICU is a fact that was

21  represented to you by either Kathryn Gay or her

22  counsel?

23     A.    Certainly not by Kathryn Gay because I've

24  had no contact.

```
 1        Q.    Is it accurate that the fact stated in

 2    your report that K███████████   was in the ICU is

 3    a fact that was given to you by counsel?

 4        A.    It's quite possibly [sic].  In review of

 5    the records, I did have the impression that she was

 6    receiving -- that that's where her location was, but

 7    it's possibly that it came from what was

 8    communicated by counsel.

 9        Q.    Thank you, Doctor.  I won't belabor the

10    point more.  In your report on page eight here -- I

11    think it's page eight -- page eight -- you make a

12    reference and footnote -- whatever that footnote

13    is -- "Adapted from Campbell K, Peebles R. Eating

14    disorders in children and adolescents: state of the

15    art review".  That is to represent that the criteria

16    you utilize above there on pages -- I believe it is

17    five through eight -- are distilled or adapted,

18    using your words, from this 2014 article in

19    Pediatrics authored by Campbell and Peebles; is that

20    correct?

21        A.    That is correct, but then I elaborated the

22    criteria that are set by Children's Hospital of

23    Philadelphia Eating Disorders Assessment and

24    Treatment Program.
```

1    Q.   How did you elaborate?  Can you explain

2  what you mean by that?

3    A.   Well, continue on in my report.

4                    - - -

5         (Indistinguishable cross-talk.)

6                    - - -

7         THE WITNESS:  You're going up.

8  BY MR. HARRINGTON:

9    Q.   In Table 2, the column "Criteria for

10  Inpatient Hospitalization in Eating Disorders," are

11  those criteria adapted from this article in

12  Pediatrics in 2014?

13    A.   Yes.

14    Q.   And you said you expanded that?

15    A.   Go down in the report.

16    Q.   Where am I going?

17    A.   There, there.

18    Q.   Are these different than --

19    A.   Essentially, the same.  These are the

20  criteria that are established by Children's Hospital

21  of Philadelphia Eating Disorders and Assessment

22  Treatment Program.

23    Q.   And you got those -- those criterias [sic]

24  are in large part adapted from that 2014 article,

1   of K███████, correct?

2        A.   That's my understanding, yes.

3        Q.   In your practice, if a custodial parent

4   wants to come to an appointment, are you permitted

5   to restrict them from coming to the appointment?

6        A.   No.

7        Q.   Go to page 38.  Page 38 indicates at the

8   second highlighted portion there that K██████ was

9   tolerating the malnutrition protocol thus far, but

10  remains significantly malnourished.  Also, inpatient

11  medical management for monitored refeeding remains

12  indicated at this time.  What is refeeding,

13  Dr. King?

14       A.   I mean, my impression of that is

15  encouraging her to continue to eat.

16       Q.   Are there any specific parameters that

17  practitioners in this field are concerned about when

18  initiating refeeding for a patient who's admitted

19  for an eating disorder?

20       A.   I'm not an eating disorder specialist.

21  That's a subspecialty.  It's not what I've been

22  called to respond to.  What was -- this was on

23  June 17th?

24       Q.   June 17th, yes.

1    Q.    Okay.   Well, counsel indicated that --

2    A.    [Audio distortion] that she doesn't -- she

3  really, really, way down deep inside is gonna oppose

4  any therapy.

5         MR. HARRINGTON:   We'll go off the record.

6         Counsel had indicated that we -- might be a

7         good time for a break.   That's fine by me.

8         Paul, I just wanted to get a check-in on where

9         we are on the record.

10        THE TECHNICIAN:   Counsel, let me just go

11        off the record first.   We're off the record,

12        1:56 p.m.

13                        -  -  -

14        (Whereupon there was a recess in the

15        proceeding from 1:56 p.m. to 2:32 p.m.)

16                        -  -  -

17        THE TECHNICIAN:   We are back on the

18        record, 2:32 p.m.

19  BY MR. HARRINGTON:

20    Q.    All right, Dr. King.   Thank you very much.

21  I just wanted to revisit one quick thing I thought

22  of.   You had indicated that, to date, not including

23  today's deposition, you had spent a certain number

24  of hours in being an expert on this matter, the

1  various responsibilities.  I believe the number was

2  11?

3       A.   Yeah [audio distortion].  Yeah.

4       Q.   Eleven hours, okay.  And that's for

5  reviewing the 700-some odd pages of CHOP documents,

6  drafting the report, going through and reviewing all

7  of the 20-some odd scholarly articles that you had

8  referenced in the report?

9       A.   And writing draft and rewriting and

10  rewriting and re -- re -- [audio distortion] --

11       Q.   I think I'm approaching it from a

12  different end of 11 hours.  I think my clients would

13  appreciate your efficiency if I worked as quickly as

14  you did, but I just wanted to confirm that 11

15  hours --

16       A.   Oh.  Should it be 20?

17       Q.   I'm not gonna have your folks pay you more

18  than you are but -- okay.  All right.  Back to -- we

19  were looking at medical records.  I believe it was

20  CHOP records selected that we had up on the screen.

21  Paul -- okay, yes.  We addressed this, and what I

22  want to move on to is page 48, please.  All right.

23  So after -- we looked through the records, and the

24  records show that, at least as of June 20th, the

1  likely to have atypical presentations.  Instead of

2  rapid weight loss, they may present with failure to

3  make expected gains in weight or height."  Do you

4  agree with that, that younger patients have atypical

5  presentations sometimes?

6       A.   Yes.  I'm not a eating disorder physician,

7  but, yes, I could agree to that.  Younger patients

8  present -- different aged patients present in

9  different ways with lots of conditions.  That's not

10  unusual.

11       Q.   All right.  Let's go three pages further

12  to page 586.

13       A.   Little kids are not -- kids are not little

14  adults.

15       Q.   In terms of -- this article discusses

16  treatment modalities, and it indicates in here that,

17  "The treatment threshold for eating disorder

18  adolescents should be low because of potentially

19  irreversible effects of eating disorders on growth

20  and development."  The article mentions that

21  children and adolescents are triaged based upon

22  severity of illness, duration of disease, safety

23  considerations, and familial preferences.  Do you

24  agree that all of those factors contribute to the

1  bulimia.

2       A.   Okay.  I mean, for anorexia, the lower

3  heart rate, the lower blood pressure, orthostatic

4  changes in pulse -- this is all for AN -- cardiac

5  arrhythmias as determined by an EKG, hypothermia,

6  which is low temperature, you know, lower than ideal

7  body weight, body fat, refusal to eat, failure to

8  respond to outpatient treatment.

9       Q.   So I heard you say hypothermia.  So it's

10  your contention that out of that -- out of both

11  columns, there are criteria in both columns that

12  pertain to anorexia and both columns that pertain to

13  bulimia or --

14       A.   Not sure what you're getting at.  Can you

15  say that again?

16       Q.   It lists two columns, each with a heading.

17  Do the criteria on the left pertain to anorexia, and

18  the criteria on the right pertain to bulimia?

19       A.   That's my understanding, yes, but it's not

20  a all-inclusive list with either one.

21       Q.   So the chart you created, does it make

22  that distinction, the chart in your report?

23       A.   Right.

24       Q.   That chart in your report -- we can pull

1    it up if you'd like -- lists all of these criteria,

2    correct?

3         A.   I mean, the criteria -- I mean, potassium

4    [indiscernible] bulimia, but concern about potassium

5    is also concern about anorexia.  This is not an

6    all-inclusive list.  I mean, there is some

7    spillover.  I mean, cardiac arrhythmias, you know,

8    are listed, including prolonged QT.  This isn't

9    bulimia, but just arrhythmia [indiscernible]

10   anorexia nervosa.  So, you know, they're not

11   clear-cut separate columns, but there is a lot of

12   spillover, and there are other things that aren't

13   listed in either column that would apply.

14        Q.   So let me just recap and make sure I

15   accurately understand what you're talking about.  So

16   you have a chart in your report that lists all of

17   these criteria that pertain to anorexia and bulimia,

18   correct?

19        A.   Mm-hmm, yes.

20        Q.   K████ was not diagnosed with bulimia, but

21   only anorexia, correct?

22        A.   Correct.

23        Q.   And you've referenced that there are other

24   criteria that may exist that are not on this chart

Case 2:18-cv-02880-NIQA  Document 234  Filed 02/23/23  Page 78 of 99

Deposition of Frank H. King, M.D                    Kathryn Gay v. The Children's Hospital of Philadelphia, et al.

1  that could factor into the diagnosis?

2       A.   Correct.

3       Q.   So aren't you stating that the criteria

4  you base your report upon is an incomplete list?

5       A.   Can I get the -- I have a paper copy of my

6  report, unless you want to bring it up.

7       Q.   We can bring up the report.  I believe

8  it's Exhibit 3, pages six through eight or so.

9       A.   That was quick.

10      Q.   If we go down to the next page, it's the

11 key area where it references -- that's your report,

12 Dr. King.

13      A.   Okay.  Do I have control of this?  No.

14 Okay, there we go.  Yup.  So these are -- the title

15 is for eating disorders.  That's the umbrella over

16 AN, BN, restricted eating, et cetera.  So there is

17 some overlap, but if you go down to esophageal

18 tears, that would mostly apply to bulimia, but there

19 were no [audio distortion].

20      Q.   So you're referencing that a criteria for

21 bulimia and having none noted, what bearing does

22 that have on a patient with anorexia?

23      A.   It does not.  The criteria for inpatient

24 hospitalization has been -- the label and the

```
 1   heading, "Criteria for Inpatient Hospitalization in

 2   Eating Disorders," I'm not specifying bulimia,

 3   anorexia, or anything else; I'm talking generically.

 4        Q.   But you're not talking generically when

 5   you go through the report and you go through

 6   statistics and you say because these criteria

 7   weren't met, K▮▮▮▮ didn't need inpatient care; but

 8   you failed to state these criteria, in certain

 9   instances, are inapplicable to anorexia.  That's the

10   issue that I'm trying to explore here is, aren't

11   there criteria you purport to govern K▮▮▮▮'s

12   inpatient admission that have absolutely nothing to

13   do with K▮▮▮▮'s diagnosis?

14             MR. LACY:  Objection to form.  Compound,

15        vague.  I just don't under -- that was such a

16        long question I just lost track, but maybe

17        Dr. King knows.

18   BY MR. HARRINGTON:

19        Q.   I'll rephrase.  I'll make it easier.  Are

20   there criteria that you state govern K▮▮▮▮'s

21   inpatient necessity that do not apply to her as a

22   patient with anorexia?

23        A.   Restate that question again.

24        Q.   Your report lists certain criteria.  We
```

1   will agree -- you have agreed that certain of those

2   criteria don't have to do with anorexia, right?

3       A.   Correct, correct.  They're eating -- they

4   apply to eating disorders.  Right.

5       Q.   Understood.  But your report concludes

6   that based upon the failure of K███████'s vitals to

7   cross certain thresholds on these criteria,

8   inpatient care was not indicated, right?

9       A.   Yes, and I have listed -- the published

10  criteria that the eating disorder program at CHOP is

11  honing in on is listed.  I have that on the screen

12  right now.

13      Q.   Understood.  But some of those, like

14  esophageal tears, for example, you indicate it

15  pertains only to bulimia?

16      A.   That is correct.

17      Q.   So your report provides --

18      A.   Bulimia is an eating disorder.

19      Q.   But not one that K██████ has, right -- had?

20      A.   Right.  As far as I'm aware, at that point

21  in time that is correct, although she was purging.

22      Q.   So all I'm simply asking is, are some of

23  the criteria upon which you base your ultimate

24  opinion criteria that do not apply to the diagnosis

# Exhibit D



The Childrens Hospital of
Philadelphia                         MRN: 02620843, DOB: ▮▮▮▮  Sex: F
34th St and Civic Center Blvd   Adm: 6/14/2016, D/C: 7/1/2016
Philadelphia PA 19104
Hospital Encounter

The Children's Hospital
of Philadelphia®

**ED Provider and Nursing Notes (continued)**

Consult adolescent to determine if patient requires inpatient management or if she is safe to be discharged to restart admission process to Renfrew tomorrow.

**Consults / Communication:**
Discussed plan with Consult service: adolescent.  Recommendations: admit for monitoring of BP

**Procedures**:
None

**Pertinent Results**:
Labs Reviewed
CBC,PLATELET, WITH DIFFERENTIAL - Abnormal; Notable for the following:
    RBC                                       3.56 (*)
    HGB                                       11.1 (*)
    HCT                                       33.5 (*)
    RDW with Standard Deviation     48.1 (*)
    Nucleated RBC               0.1 (*)
    Neutrophils                  35.3 (*)
    Lymphocytes               56.9 (*)
    Absolute Lymphocytes       4330 (*)
    All other components within normal limits
BASIC METABOLIC PANEL - Abnormal; Notable for the following:
    Potassium                 3.6 (*)
    Urea Nitrogen             18 (*)
    All other components within normal limits
MAGNESIUM
PHOSPHORUS

Orthostatic by HR
EKG: sinus bradycardia

**Response / Reassessments**:


Final diagnoses:
**Hypotension determined by examination**

**Disposition**:
Admit to inpatient unit for intravenous fluids and ongoing monitoring of intake and output to assess for progression of illness.

**Resident / NP / MedStudent / Fellow**: Treatment Team: CRNP: Rockey, Alison A, CRNP

**Attending Attestation:**
NP/PA with attending: I performed a history and physical examination of the patient and discussed the management with the advanced practice provider.  I reviewed their note and agree with the documented findings, except as noted. Angela M Ellison, MD. Date of service: 6/14/2016

Attending statement:
K▮▮▮▮▮▮▮ is a 12 year old female with anxiety and eating disorder/malnutrition who presents with



The Childrens Hospital of
Philadelphia
34th St and Civic Center Blvd
Philadelphia PA 19104
Hospital Encounter

MRN: 02620843, DOB: ████████ Sex: F
Adm: 6/14/2016, D/C: 7/1/2016

The Children's Hospital
of Philadelphia®

**ED Provider and Nursing Notes (continued)**

request for lab testing.  Patient planned to be placed in outpatient facility for treatment of eating disorder but
had incomplete labs and noted hypotension. On exam, alert, mild to moderate malnourished. Noted
bradycardia. Discussed with adolescent service, recommend admission for monitoring.



| | The Childrens Hospital of Philadelphia<br>34th St and Civic Center Blvd<br>Philadelphia PA 19104<br>Hospital Encounter | ▓▓▓▓▓▓<br>MRN: 02620843, DOB: ▓▓▓▓▓ Sex: F<br>Adm: 6/14/2016, D/C: 7/1/2016 |
|---|---|---|

**History & Physical**

H&P by Lantzouni, Eleni, MD at 6/15/2016  8:45 AM

| Author: Lantzouni, Eleni, MD | Service: Adolescent | Author Type: Physician |
|---|---|---|
| Filed: 6/15/2016  4:38 PM | Date of Service: 6/15/2016  8:45 AM | Status: Addendum |
| Editor: Lantzouni, Eleni, MD (Physician) | | |
| Related Notes: Original Note by Castellanos, Angela, MD (Resident) filed at 6/15/2016  8:45 AM | | |

**The Children's Hospital of Philadelphia**

**ADOLESCENT EATING ADMISSION NOTE**

**HPI:**

K▓▓▓▓▓▓▓▓ is a 12 year old female with anxiety and restrictive eating presenting with bradycardia, mild to moderate malnutrition.

Noted to have 11 lb weight loss since October. Mom reports that around that October K▓▓ began feeling more self conscious about her body and commenting on her thighs. Reported becoming vegetarian around winter time. Issues with eating first surfaced around this time. Notably, parents have joint custody and K▓▓ spend alternating weeks at mom and then dad's house. Mom and dad have a contentious relationship, particularly around K▓▓'s anxiety and eating behavior.

Mom reports that K▓▓ was vegetarian at mom's house, not at dad's. A few months ago noted that K▓▓ was bringing home energy/caffeine and diet drinks and banned them from her house. Dad then reported that K▓▓ was drinking these beverages at dad's house and also found that she was hiding food around her room at dad's house. Mom denies this behavior at her house. No purging behavior noted or reported.

Mom reports that K▓▓'s dad has force-fed her meat and also milk and shakes in the setting of her refusing food and restricting. As a result she is no longer eating milk/dairy and began having more stress around food and dad. Since about mid April, Mom noted that K▓▓ also began restricting calories at Mom's house, counting calories and, eating about 500-1000 calories a day (eggs, cereal, small meals). Also preference for diet foods. At this point mother became concerned. Also noted at pediatrician's office that she had lost significant weight. Around this time K▓▓ also began seeing behavioral health for her anxiety. K▓▓ reports that there is significant anxiety about her parent's relationship and that Dad's presence exacerbates her restrictive eating.

Around early May, mom became more acutely concerned about weight loss and began looking into outpatient eating disorder treatment options. Was at intake for renfrew on day of presentation when she was noted to not have a phorphorous level as requested and low blood pressures and EKG with sinus bradycardia. She was sent to CHOP ED to follow-up on her medical stability and was noted to be bradycardic here as well. She was admitted for further characterization of her nutritional status, medical stability and her malnutrition.

Recently, has had improvement in her intake, especially over last week or so. Attributes this improvement to not being around Dad and giving K▓▓ more control over her food options. Mom estimates about 2000 kcal daily over last week and K▓▓ making meals on her waffle iron. She's been very diligent about her nutritional intake and protein intake as well.

Otherwise, no dizziness with standing, no palpitations, no syncope, no recent fevers, diarrhea illness about 1 week ago with other family members with similar symptoms.



The Children's Hospital of
Philadelphia

The Childrens Hospital of
Philadelphia
34th St and Civic Center Blvd
Philadelphia PA 19104
Hospital Encounter

MRN: 02620843, DOB: ██████ Sex: F
Adm: 6/14/2016, D/C: 7/1/2016

**Progress Notes (continued)**

**Progress Notes by Louis-Jacques, Jennifer, MD at 6/20/2016  6:50 AM (continued)**

| Calcium | 9.2 | 9.4 | 9.2 | 8.9 |
|---|---|---|---|---|
| Phosphorus | 5.7 (H) | 5.7 (H) | 5.1 | 5.6 (H) |
| Magnesium | 2.0 | 2.0 | 1.9 | 1.9 |

FSH 4.2
LH <0.2
Prolactin 21.4

Celiac panel negative

**Pertinent Imaging Results:**
No new images.

**Assessment:**
K███ is a 12 year old female, with Medical Instability: Bradycardia and has had an 11 lbs weight loss over 6 months. K███ is being admitted for:malnutrition, underweight and bradycardia and has had a history of restricting and anxiety. K███ is tolerating the malnutrition protocol thus far with continued weight gain. However she remains significantly malnourished (76.3% goal weight) as well as orthostatic by HR. Bradycardia continues to improve. Patient medically stable for transfer to residential/inpatient eating disorder program.

**Psychiatric diagnoses /assessment if known:** Anorexia Nervosa, restricting type

1. Malnutrition - ddx anorexia nervosa, food restriction secondary to stress, other ED NOS
- **Malnutrition protocol: currently at 4000 kcal. Will hold at this caloric intake at this time**
- 3 L fluid min
- nutrition following
- refeeding labs (BMP/Mg/Phos) daily
- daily Miralax
- **Activity: seated shower + 1 WCR, 2 walks**

2. Psych - significant anxiety around parental relationship and food
- currently in outpatient therapy
- suicidal ideation: none
- behavioral health following
- 1:1 at all times

3. Social
- current custody dispute between mother and father
- pt wishes father would not visit, as he is a trigger for anxiety/eating disorder. At this time both parents allowed at bed side.
- reported DHS cases open on both parents
- SW following

Disposition: pending overnight HR >45, weight gain on appropriate meal plan and formulation of appropriate management plan (eating disorder program such as Renfrew vs. FBT)
- nutrition teaching
- parents choosing meals
- update PCP w/ changes to plan and when ready for d/c



The Childrens Hospital of
Philadelphia                         MRN: 02620843, DOB: ▮▮▮▮  Sex: F
34th St and Civic Center Blvd  Adm: 6/14/2016, D/C: 7/1/2016
Philadelphia PA 19104
Hospital Encounter

**Progress Notes (continued)**

**Progress Notes by Lantzouni, Eleni, MD at 7/1/2016  3:50 AM (continued)**

| |
|---|
| Goal weight: 52.9 kg |
| % of goal weight:  77.5 |
| BMI  Body mass index is 17.39 kg/(m^2). |
| Median BMI:18.4 (93%) |

**Vitals signs:**

| Current | 24h Min/Max |
|---|---|
| Weight: 42.6 kg (07/01/16 0629) | |
| Temp: 36.8 °C (06/30/16 2000) | Temp  Min: 36.7 °C  Max: 36.8 °C |
| Pulse: (!) 133 (07/01/16 0629) | Pulse  Min: 64  Max: 133 (60 on monitor |
| Respiratory Rate: 16 (07/01/16 0629) | Resp  Min: 16  Max: 16 |
| BP: 110/73 (07/01/16 0629) | BP  Min: 96/55  Max: 110/73 |
| | No Data Recorded |

CR Monitor Low HR: 58

Orthostatic changes by HR: supine 96/55 -> upright 110/73
Orthostatic changes by BP: supine 64 --> upright 133
Orthostatic by HR, not symptomatic

**Intake/Output:**
06/30 0700 - 07/01 0659
In: 3290 (77.2 mL/kg) [Enteral:3290 (3.2 mL/kg/hr)]
Out: 3650 (85.7 mL/kg) [Urine:3650 (3.6 mL/kg/hr)]
Net: -360
Weight: 42.6 kg

**Physical Examination**
General:  Thin, sleeping but appropriately awake to voice, no acute distress
Head:  normocephalic, atraumatic
ENT:  mucous membranes moist
Lungs:  no increased work of breathing and clear to auscultation bilaterally
Cardiac:  Normal rate and rhythm, no murmur, S1/S2
Abdomen: thin, normoactive bowel sounds. Soft, nontender, and nondistended
Neurologic: gross motor exam normal by observation
Psych: normal mood and affect

**Pertinent Laboratory Results:**
No new results

**Pertinent Imaging Results:**
No new images.

**Assessment:**
K▮▮▮ is a 12 year old female, with Medical Instability: Bradycardia and has had an 11 lbs weight loss over 6



The Childrens Hospital of
Philadelphia                          MRN: 02620843, DOB: ▮▮▮▮▮  Sex: F
34th St and Civic Center Blvd  Adm: 6/14/2016, D/C: 7/1/2016
Philadelphia PA 19104
Hospital Encounter

## Progress Notes (continued)

**Progress Notes by Lantzouni, Eleni, MD at 7/1/2016  3:50 AM (continued)**

months. K▮▮▮▮ is being admitted for malnutrition, underweight and bradycardia and has had a history of restricting and anxiety. K▮▮▮▮ continues to tolerate the malnutrition protocol with improvement in her nutritional status. However she remains significantly malnourished (77.5 % goal weight) as well as orthostatic by HR. Patient medically appropriate for transfer to next level of care.

**Psychiatric diagnoses /assessment if known:** Anorexia Nervosa, restricting type

**# Malnutrition** - ddx anorexia nervosa, food restriction secondary to stress, other ED NOS
- **Malnutrition protocol: maintain at 4400 kcal, 3 L fluid min** - continue to encourage fluid intake
- Goal weight 52.9kg
- **Remains orthostatic by HR**, not symptomatic
- Nutrition following
- Refeeding labs (BMP/Mg/Phos) Tues/Thurs
- Miralax PRN
- **Activity: seated shower, 3 walks**

**# Psych** - significant anxiety around parental relationship and food
- Currently in outpatient therapy
- Will need residential/inpatient treatment but remains orthostatic by HR at this time
- Suicidal ideation: none
- Behavioral health following
- Losing weight with 1:1 only during meals/rests/snacks, suspect covert exercise or purging --> Increased to 24 hour 1:1 on 6/28

**# Social**
- Current custody dispute between mother and father
- Pt wishes father would not visit, as he is a trigger for anxiety/eating disorder. At this time both parents allowed at bed side.
- Reported DHS case remains open regarding mother
- SW following

**# Disposition:** pending overnight HR >45, weight gain on appropriate meal plan and formulation of appropriate management plan (will need residential treatment program as parents unable to participate in FBT)
- Update PCP when ready for d/c
- Awaiting disposition from Brandywine Hospital at this time - inpatient program is the most appropriate dispo
- **Notified of Renfrew acceptance this morning.  To start 9am on 7/6.  Plan to discharge after dinner when Mom is out of work. Dad will also be present for teaching/discharge instructions today.  Both Mom and Dad to receive copies of all discharge instructions/teaching materials. Mom and Dad to decide where K▮▮▮▮ will stay at discharge.**

Lisa Niswander, MD PhD
Pediatric Resident
The Children's Hospital of Philadelphia

**Attending Attestation for Residents & Fellows**

I have seen and examined K▮▮▮▮▮▮▮▮ today. I have reviewed the resident's/fellow's documentation. My

# Exhibit E

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KATHRYN GAY,             )
                              )
     Plaintiff,           )
                              )
     v.                    )     Case No. 2:18-cv-02880-NIQA
                              )
THE CHILDREN'S HOSPITAL OF  )
PHILADELPHIA, *et al.*         )
                              )
     Defendants.        )
                              )

## DECLARATION OF ELENI LANTZOUNI, M.D. PURSUANT TO 28 U.S.C. § 1746

**ELENI LANTZOUNI, M.D.,** being of full age, declares and states as follows:

     1.     I make this declaration on personal knowledge, the source of which is my professional responsibilities and duties as an employee of The Children's Hospital of Philadelphia ("CHOP"), including as one of the attending physicians of plaintiff's daughter, referred to in this litigation as "K", during her June 14, 2016 inpatient hospital stay at CHOP. If called to testify in this matter, my testimony would include, but not be limited to, the following information.

     2.     I have been employed by CHOP since August 1, 2013 as an attending physician. I am board-certified in pediatrics and adolescent medicine and my primary clinical focus is eating disorders in children and adolescents.

     3.     I am currently an attending physician in the Craig-Dalsimer Division of Adolescent Medicine and the Medical Director of the Eating Disorder Program at Children's Hospital of Philadelphia. I also am a Professor of Pediatrics at the University of Pennsylvania.

     4.     At the time I provided care to plaintiff's daughter, K, I was an attending physician in the Craig-Dalsimer Division of Adolescent Medicine and the Assistant Medical Director of the Eating Disorder Program at Children's Hospital of Philadelphia.

123133543-1

5.      At all times relevant, CHOP is a non-profit, private health care institution devoted to the care of children and adolescents and is an acute care hospital.

6.      Plaintiff's daughter, K, presented to the emergency department at CHOP late in the day on June 14, 2016 with severe malnutrition and was transferred to the adolescent service early the next day, as K required in-patient admission due to medical instability from anorexia nervosa. The treatment team's goal for K was to stabilize her such that she was able to be transferred to the next appropriate level of care (inpatient psychiatric eating disorder, residential, partial hospitalization, intensive outpatient or family based treatment) to continue her treatment.

7.      K was never diagnosed with bulimia nervosa while an inpatient at CHOP.

8.      K was never treated in the CHOP Pediatric Intensive Care Unit ("PICU"), which was, in 2016, and remains on a different floor of the hospital than the adolescent service.

9.      K was never on CHOP's telemetry unit for monitoring.

10.      Throughout her hospitalization, K continued to suffer from conditions including, but not limited to, bradycardia, hypotension, orthostasis by heart rate and required supplementation to complete her meal plan.

11.      I discharged K from CHOP on Friday, July 1, 2016 because CHOP was notified that same day of her acceptance to an intensive outpatient treatment at the Renfrew Center of Southern NJ ("Renfrew") with a July 6, 2016 start date, and K was medically stable for transfer to that program.

12.      Following her discharge from CHOP upon Renfrew's acceptance, K received no further treatment from CHOP after July 1, 2016.

13.      Throughout the entire admission, CHOP, through its clinical providers was, at all times, providing necessary medical treatment to K to stabilize her medical conditions such that K

could be safely transferred to a facility to provide the next appropriate level of care for additional treatment for the malnutrition and anorexia nervosa diagnoses outside of an acute medical care setting.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this ⟶ 23ʳᵈ day of February, 2023.

_____
ELENI LANTZOUNI, M.D.

# Exhibit F



**UnitedHealthcare** Community Plan
Community Plan

**UnitedHealthcare® Community Plan**
1001 Brinton Road
Pittsburgh, PA 15221

Date: 07/06/2016
188PAEDAPR1002001-00162-01
FRANK KING
2400 CHESTNUT ST LBBY LEVEL
PHILADELPHIA PA 19103-4316

Member:                           K▆▆▆▆▆▆▆▆
Member ID#:                       ▆▆▆▆▆▆▆
Requesting Provider:              Childrens Hosp Philadelphia
Authorization Number:             209963266

Dear Frank King:

UnitedHealthcare® Community Plan has reviewed the request and **approved the service(s) on the following page.**

The reference or authorization number provided is not an unconditional guarantee of payment. UnitedHealthcare® reserves the right to rescind its authorization and deny payment if any one of the following events occurs where payments previously made can also be the subject of recoupment against future claims owed based on UnitedHealthcare's ® retrospective review protocols:

1. The member was not eligible for coverage at the time of service;
2. The services rendered are considered excluded from coverage;
3. The member has exceeded the applicable covered benefit limitations; and/or
4. The services were never rendered or were the result of fraud, waste or abuse.

If you have any questions, please call Member Services at 1-800-414-9025.

Note:  Any additional units requested may be subject to medical necessity review.

Sincerely,

UnitedHealthcare® Community Plan

cc. Servicing Provider: Childrens Hosp Philadelphia
cc. Requesting Provider: Childrens Hosp Philadelphia

Approved Services                    RE: K█████████                        Member ID: ████████

**Dates of Service/Probable Date of Admission:** - 06/26/2016 - 06/30/2016
**Number of Units:** 5
**Description of approved Service:** Hospital Admit
**Next Review Date:** 06/30/2016

If you need this information in another language, call 1.800.414.9025 (TTY: 711) Monday, Tuesday, Thursday and Friday from 8 a.m. to 5 p.m. or Wednesday 8 a.m. to 8 p.m.

Si necesita esta información en otro idioma, llame al 1.800.414.9025 (TTY: 711), los lunes, martes, jueves y viernes, de 8 a. m. a 5 p. m.; o los miércoles, de 8 a. m. a 8 p. m.

ប្រសិនបើលោកអ្នក ចាំបាច់ត្រូវការព័ត៌មាននេះជាភាសាមួយផ្សេងទៀត សូមទាក់ទងតាមទូរស័ព្ទលេខ៖ 1.800.414.9025 (TTY: 711)។

如果需要其他语言版本的此信息, 请致电 1.800.414.9025 (TTY: 711) 。 • Nếu bạn cần thông tin này bằng ngôn ngữ khác, hãy gọi số 1.800.414.9025 (TTY: 711).

При необходимости получения данной информации на другом языке позвоните 1.800.414.9025 (TTY: 711).

UnitedHealthcare® Community Plan  1001 Brinton Road Pittsburgh, PA 15221

approval 07/06/2016-tp



**UnitedHealthcare® Community Plan**
1001 Brinton Road
Pittsburgh, PA 15221

Date: 06/28/2016
180PAEDAPR1002001-00139-01
FRANK KING
2400 CHESTNUT ST LBBY LEVEL
PHILADELPHIA PA 19103-4316

| | |
|---|---|
| Member: | K███████████ |
| Member ID#: | ██████████ |
| Requesting Provider: | Childrens Hosp Philadelphia |
| Authorization Number: | 209963266 |

Dear Frank King:

UnitedHealthcare® Community Plan has reviewed the request and **approved the service(s) on the following page.**

The reference or authorization number provided is not an unconditional guarantee of payment. UnitedHealthcare® reserves the right to rescind its authorization and deny payment if any one of the following events occurs where payments previously made can also be the subject of recoupment against future claims owed based on UnitedHealthcare's ® retrospective review protocols:

1. The member was not eligible for coverage at the time of service;
2. The services rendered are considered excluded from coverage;
3. The member has exceeded the applicable covered benefit limitations; and/or
4. The services were never rendered or were the result of fraud, waste or abuse.

If you have any questions, please call Member Services at 1-800-414-9025.

Note: Any additional units requested may be subject to medical necessity review.

Sincerely,



UnitedHealthcare® Community Plan

cc. Servicing Provider: Childrens Hosp Philadelphia
cc. Requesting Provider: Childrens Hosp Philadelphia

Approved Services            RE: K█████████            Member ID: █████████

**Dates of Service/Probable Date of Admission:** - 06/23/2016 - 06/25/2016
**Number of Units:** 3
**Description of approved Service:** Hospital Admit
**Next Review Date:** 06/25/2016

If you need this information in another language, call 1.800.414.9025 (TTY: 711) Monday, Tuesday, Thursday and Friday from 8 a.m. to 5 p.m. or Wednesday 8 a.m. to 8 p.m.

Si necesita esta información en otro idioma, llame al 1.800.414.9025 (TTY: 711), los lunes, martes, jueves y viernes, de 8 a. m. a 5 p. m.; o los miércoles, de 8 a. m. a 8 p. m.

ប្រសិនបើលោកអ្នក ចាំបាច់ត្រូវការព័ត៌មាននេះជាភាសាមួយផ្សេងទៀត សូមទាក់ទងតាមទូរស័ព្ទលេខៈ 1.800.414.9025 (TTY: 711)។

如果需要其他语言版本的此信息, 请致电1.800.414.9025 (TTY: 711)。 • Nếu bạn cần thông tin này bằng ngôn ngữ khác, hãy gọi số 1.800.414.9025 (TTY: 711).

При необходимости получения данной информации на другом языке позвоните 1.800.414.9025 (TTY: 711).

UnitedHealthcare® Community Plan  1001 Brinton Road Pittsburgh, PA 15221

approval 06/28/2016-tp



United**Health**care®

Community Plan

**UnitedHealthcare Community Plan**
1001 Brinton Road
Pittsburgh, PA 15221



June 17, 2016

**Member ID: 908070324**
**DOB:** ███████

**To the Parents or Guardian of:**
K█████████
█████████████
**Philadelphia, PA 19103**

**Subject: UnitedHealthcare Community Plan for Kids**

Dear Parent or Guardian of K█████████:

**UnitedHealthcare Community Plan ("UnitedHealthcare")** has reviewed the request for **an inpatient hospital admission** submitted by **Children's Hospital of Philadelphia** on behalf of K█████████ on **06/15/16**. After physician review, the request for service/item is:

Denied completely because: The doctor admitted your child to the hospital on 06/14/16. It was not medically necessary. We looked at the medical records sent to us. It is not medically necessary. It seems your child could have been treated for failure to thrive in the outpatient department. Your child did not need to be admitted to the hospital for this care. The reason is your child is medically stable. The hospital stay is not covered. Observation is approved if ordered by your child's doctor.

UnitedHealthcare Community Plan for Kids is offered to you under a contract between UnitedHealthcare and the Pennsylvania Insurance Department. That contract, incorporating the Pennsylvania Insurance Department's Request for Proposal, allows UnitedHealthcare to decide whether the above request is medically necessary in the amount and duration prescribed after reviewing all information in our files and submitted by your child's doctor. UnitedHealthcare used the Pennsylvania Insurance Department's definition of medically necessary and applied criteria approved by the Pennsylvania Insurance Department in making this decision.

**This decision will take effect on 06/17/16**

**IF YOU DO NOT AGREE WITH THIS DECISION, YOU MAY DO ONE OR ALL OF THE FOLLOWING:**

<u>**1) Request Criteria**</u>

You may request a copy of the medical necessity criteria or other rules on which the decision was based by sending a written request to:

10/2012 tp- PACHIP

**UnitedHealthcare Community Plan**
**Attn: Grievance Coordinator**
**1001 Brinton Road**
**Pittsburgh, PA 15221**

## 2)  File a  Complaint or Grievance

You may file a complaint or grievance with **UnitedHealthcare within 45 days from the date you get this notice.**   Your complaint or grievance will be decided no later than 30 days from when we receive it.

To file a complaint or grievance, send it to **UnitedHealthcare** at the following address

**UnitedHealthcare Community Plan**
**Attn: Grievance and Appeals Department**
**P.O. Box 31364**
**Salt Lake City, UT  84131**

Your complaint or grievance must be filed in writing.  However, if you are disabled or have Limited English Proficiency, you may file your complaint or grievance verbally by calling **UnitedHealthcare** at 1-800-414-9025.  If you want your provider to file the complaint or grievance for you, you must give your written approval for the provider to do so.

If your doctor certifies in writing that your life, health, or ability to maintain maximum function will be jeopardized by the normal complaint or grievance process, you can file an expedited internal complaint or grievance with **UnitedHealthcare** by calling **1-800-414-9025/TTY 711**.  Your complaint or grievance will be put into written form and will be reviewed by the Medical Director.  Within 48 hours, you will receive a call from **UnitedHealthcare** with our decision.

If you have been receiving the service(s) that are being reduced, changed, or denied and you file a complaint or grievance that is hand delivered or postmarked within 10 days of the date of this notice, the services will continue until a decision on the complaint or grievance is made.

If the request is approved in part, you may receive the approved service(s) while your complaint or grievance on the disapproved service or amount is being decided.

If you file a complaint or grievance, you may request all documents relevant to this decision by sending a written request for the information to the following address:

**UnitedHealthcare Community Plan**
**Attn:  Grievance and Appeals Department**
**1001 Brinton Road**
**Pittsburgh, PA 15221**

You have the right at any time during the process to appoint a representative or an impartial **UnitedHealthcare** employee to help you prepare and file your complaint or grievance.  If you need help filing a complaint or grievance, you may call us at **1-800-414-9025/TTY 711,** the legal aid office at 1-800-322-7572 (www.palegalservices.org), or the Pennsylvania Health Law Project at 1-800-274-3258 (www.phlp.org).

October 2012-tp Chip inpatient

KING_020

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| KATHRYN GAY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CHILDREN'S HOSPITAL OF | ) |
| PHILADELPHIA, ELENI LANTZOUNI, | ) Case No. 2:18-cv-02880-NIQA |
| JENNIFER LOUIS-JACQUES, MICHELE | ) |
| ZUCKER, LEELA JACKSON, KATIE | ) |
| HOEVELER, MORTIMER PONCZ, AND | ) |
| ALAN R. COHEN | ) |
| | ) |
| Defendants. | ) |

**CERTIFICATE OF SERVICE**

I, Patrick Harrington, Esquire, do hereby certify that the foregoing, Defendants' Motion for Leave and Motion *In Limine* and brief in support were filed electronically via the Court's electronic filing system on the date set forth below and, therefore, made available to all counsel of record.

Date: February 23, 2023          */s/ Patrick Harrington*

Patrick Harrington, Esquire
**Dilworth Paxson LLP**
*Attorneys for Defendants*